IN THE CIRCUIT COURT OF THE
13TH JUDICIAL CIRCUIT IN AND FOR
HILLSBOROUGH COUNTY, FLORIDA

CASE NO.: 17-CA-010979

BRYAN A. ISA, Individually
and as Personal Representative of the          DIVISION J
Estate TAMI D. ISA,

  Plaintiff,

v.

JOHNSON & JOHNSON,
JOHNSON & JOHNSON HOLDCO (NA) INC.,
  f/k/a Johnson & Johnson Consumer Inc.,
  individually and successor in interest to
  Johnson & Johnson subsidiary "Old JJCI",
JANSSEN PHARMACEUTICALS, INC., individually and as
  successor in interest to Johnson & Johnson
  subsidiaries named Johnson & Johnson Consumer Inc.,
  both prior to and after its 2021 restructurings and
  colloquially known as "Old JJCI" and "New JJCI",
KENVUE INC., individually and as successor in interest
  to Johnson & Johnson Consumer Inc.,
RED RIVER TALC LLC, individually and as successor
  in interest to Johnson & Johnson Consumer, Inc., and
PUBLIX SUPER MARKETS, INC.,

  Defendants.

_____/

**PLAINTIFF'S THIRD AMENDED WRONGFUL DEATH COMPLAINT AND DEMAND
FOR JURY TRIAL**

  BRYAN A. ISA, Individually and as Personal Representative of the Estate of TAMI D.

ISA, by and through undersigned counsel, hereby sues Defendants, JOHNSON & JOHNSON,

JOHNSON & JOHNSON HOLDCO (NA) INC., JANSSEN PHARMACEUTICALS, INC.,

KENVUE INC., RED RIVER TALC LLC , and PUBLIX SUPER MARKETS, INC. (collectively,

"Defendants"), alleging as follows:

1

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action for damages in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00), exclusive of interest and costs.

2.      Plaintiff BRYAN A. ISA ("Plaintiff") seeks an award of damages for the wrongful death of his wife, TAMI D. ISA ("Decedent"), under the Florida Wrongful Death Statute, on behalf of the estate of Decedent and all of her statutory survivors including her husband, BRYAN A. ISA, and children, RHIANNON ISA, ADDISON CHATTIN, and CHERILYN CHATTIN.

3.      On June 7, 2019, the Circuit Court for Hillsborough County, Florida, Probate Division, entered an order appointing Plaintiff as personal representative of the Estate.

4.      Plaintiff and Decedent married in approximately 2003.

5.      At all relevant times, Plaintiff resided with Decedent in and/or around Hillsborough County, Florida.

6.      From approximately the 1970s until her diagnosis, Decedent purchased and applied Johnson & Johnson Baby Powder and Johnson & Johnson Shower to Shower (collectively, the "PRODUCTS") to her body, including her perineal area, on a daily basis in Hillsborough County, Florida.  At all relevant times, the PRODUCTS were made with talcum powder.

7.      In or around 2011, Decedent was diagnosed with ovarian cancer, which was directly and proximately caused by her regular and prolonged exposure to talcum powder, contained in the PRODUCTS, and which developed in Florida.

8.      As a result of her ovarian cancer, Decedent passed away on December 15, 2015, at the age of forty-two (42).

9.      Defendants are corporations organized under the laws of the various states of the United States of America that were and are doing business in the State of Florida. The

2

aforementioned Defendants mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing PRODUCTS to which Decedent was exposed.

10.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation and maintains its headquarters in the State of New Jersey.   J&J may be served with process by serving its registered agent at 1 Johnson & Johnson Plaza, New Brunswick, NJ 08933. At all relevant times, upon information and belief, J&J, or its corporate subsidiaries, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed.  At all relevant times, J&J regularly transacted, solicited, and conducted business in all fifty States of the United States.

11.     Defendant Johnson & Johnson Holdco (NA) Inc. ("Holdco or JJCI2") is a New Jersey corporation with its principal place of business in the State of New Jersey. Holdco may be served with process by serving its General Counsel at 199 Grandview Road, Skillman, NJ 08558. At all relevant times, upon information and belief, Holdco, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed. At all relevant times, Holdco regularly transacted, solicited, and conducted business in all fifty states of the United States.

12.     Defendant Janssen Pharmaceuticals, Inc. ("Janssen") is a Pennsylvania Corporation with its principal place of business in the Commonwealth of Pennsylvania. Janssen may be served with process by serving its General Counsel at 1125 Trenton-Harbourton Road, Titusville, NJ 08560.  At all relevant times, upon information and belief, Janssen, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling,

3

and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed. At all relevant times, Janssen regularly transacted, solicited, and conducted business in all fifty states of the United States.

13.     Defendant Kenvue Inc. ("Kenvue") is a Delaware corporation with its principal place of business in the State of New Jersey. Kenvue may be served with process by serving its General Counsel at 199 Grandview Road, Skillman, NJ 08558.  At all relevant times, upon information and belief, Kenvue, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the asbestos-containing PRODUCTS to which Decedent was exposed. At all relevant times, Kenvue, or its predecessors, regularly transacted, solicited, and conducted business in all fifty States of the United States.

14.     Defendant Red River Talc LLC ("RRT" or "Red River") is a Texas limited liability company and a citizen of the State of New Jersey. At all relevant times, RRT, or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling and/or distributing the PRODUCTS.  At all relevant times, RRT, or its predecessors, regularly transacted, solicited and conducted business in all fifty United States.

15.     Defendant Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Polk County, Florida.  Publix may be served with process by serving its registered agent, John A. Attaway, Jr., at 3300 Publix Corporate Parkway, Lakeland, FL 33811-3311.  At all relevant times, Publix maintained offices, agents, and representatives in Hillsborough County, Florida, and was engaged in the business of promoting, selling, and/or distributing the PRODUCTS in Hillsborough County and throughout the State of Florida. Upon information and belief, Decedent purchased the asbestos-containing PRODUCTS at Publix stores located in

4

Hillsborough County, Florida, where Publix regularly conducted its customary business operations.

16.　　The Defendants named and identified herein are either (a) corporations organized under the laws of the various states of the United States of America that were and are doing business in the State of Florida that mined, milled, manufactured, sold, supplied, distributed, purchased, and/or marketed the PRODUCTS to which Decedent was exposed; or (b) are a successor in interest of such corporations described in clause "(a)" which the law holds responsible and liable for injuries and harm caused by their predecessor(s) or by their predecessor's asbestos-containing product lines it or they acquired which, as a consequence, renders them liable under law to the Plaintiff for the injuries and damages that are the subject of this suit.

17.　　Each Defendant acted at all times material herein by and through their respective or joint actual, apparent, or ostensible agents, servants, employees, and/or officers, each and all of whom were acting under, pursuant and in accordance with their authority or duties, actual, apparent, or ostensible.

18.　　All of the above-named Defendants have, at all times material to this cause of action, through their agents, officers and representatives, operated, conducted, engaged in and carried on a business venture in Florida; maintained an office or agency in this state; solicited business or provided service activities within this state, or committed a tortious act within the state by manufacturing, selling and disseminating to the public inherently dangerous products: (a) without testing said products to determine their harmful effects on persons coming in contact with said products; and (b) by failing to take any reasonable precautions or to exercise reasonable care to adequately or sufficiently warn Decedent and other persons similarly situated, of the risks, dangers and harm of contracting ovarian cancer, through exposure to, contact with, use of,

handling or manipulation of Defendants' PRODUCTS and the consequent exposure to asbestos dust and fibers resulting from the ordinary and foreseeable use of said PRODUCTS.

19.     Plaintiff's causes of action arise from each Defendant (a) selling or distributing its PRODUCTS in and throughout Florida; (b) operating, conducting, engaging in, or carrying on a business or business venture in Florida; (c) having an office or agency in Florida; (d) owning, using, possessing, or holding a mortgage or other lien on real property within Florida; (e) contracting to insure a person, property, or risk located within Florida at the time of contracting; (f) causing injury to Decedent within Florida due to an act or omission by Defendants outside Florida because, at or about the time of Decedent's injury, products, materials, or things processed, serviced, or manufactured by Defendants were used or consumed within Florida in the ordinary course of commerce, trade, or use; (g) placing products into the stream of commerce with the reasonable expectation that such products would be sold, purchased, and consumed in Florida; (h) targeting Florida as a market for Defendants' PRODUCTS; (i) targeting consumers in Florida; and/or (j) intentionally availing itself of the privilege of doing or benefiting from business in Florida.

20.     Venue and jurisdiction are proper in Hillsborough County, Florida.  Venue is proper in Hillsborough County pursuant to Florida Statutes § 47.051 and § 47.021, because (a) at least one of the Defendants against whom this action is brought, including but not limited to, PUBLIX SUPER MARKETS INC., has an agent or representative in this County, has an office for transaction of its customary business, or otherwise resides here, and/or (b) Decedent purchased and was exposed to Defendants' PRODUCTS in Hillsborough County, and was therefore injured in Hillsborough County.

6

### FACTS RELATING TO DEFENDANTS' SUCCESSOR LIABILITY STATUS

**A. DEFENDANTS' FAILED BANKRUPTCIES**

21.     The Declaration of John K. Kim in Support of First Day Pleadings in LTL's second Bankruptcy filing on April 4, 2023 ("Kim LTL Decl."), *In re: LTL Management LLC*, Case No.: 23-12825, United States Bankruptcy Court District of New Jersey ("LTL 2"), summarizes J&J's and its affiliates' corporate history that is pertinent to the claims alleged herein against the Defendants as follows:

   a. "J&J, a New Jersey company incorporated in 1887, first began selling JOHNSON'S® Baby Powder in 1894, launching its baby care line of products."

   b. "In 1972, J&J established a formal operating division for its baby products business, which included JOHNSON'S® Baby Powder…. J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products."

   c. "In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("**Omni**"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company."

   d. "In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnson & Johnson Dental Products

Company, which assumed all of its liabilities and was renamed Johnson & Johnson

Consumer Products, Inc."

   e. "In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson

      & Johnson Consumer Companies, Inc. ("J&J Consumer Companies")."

   f. "In 2015, J&J Consumer Companies merged with and into an affiliate, which then

      merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson &

      Johnson Consumer Inc. (including all former names and historical forms, "Old

      JJCI")."

   g. "Old JJCI became responsible for all claims alleging that JOHNSON'S® Baby

      Powder and other talc-containing products cause cancer or other diseases…. Old

      JJCI also became responsible for all claims alleging that Shower to Shower

      products, which contained talc, cause cancer or other diseases."

22.    J&J and its subsidiary, "Johnson & Johnson Consumer, Inc.," both in the form of

"Old JJCI" and "New JJCI" (which is identified and described below), were at all times materially

responsible for the design, labeling, marketing, distribution, and sale of J&J's body powder

product lines, including the iconic Johnson & Johnson Baby Powder product line.

23.    Each and every one of the J&J's corporate entities, including itself and its affiliated

companies involved or associated with talc business and PRODUCTS, were at all times material

to this case aware that raw talc ingredient and/or resulting talc-based PRODUCTS contained

asbestos, and each and all collectively actively concealed such fact from the public for decades.

24.    Prior to the implementation of J&J's multifaceted restructuring of its consumer

product subsidiaries in 2021, Old JJCI and its predecessors milled, manufactured, labeled, sold,

8

supplied, distributed, and/or marketed asbestos-containing PRODUCTS to which Decedent was exposed.

25.     In an effort to avoid or eliminate J&J and Old JJCI's respective responsibility and liability for injuries and harm caused by Johnson & Johnson Baby Powder, as well as other talc PRODUCTS, in or about October 2021, Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation and business law in which it split itself into two separate entities through a device referred to as a "divisive merger," more commonly known as the "Texas Two Step."

26.     The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly invented company created by J&J called "LTL Management LLC" ("LTL"). "LTL" is an acronym for "Legacy Talc Liability."

27.     LTL was immediately thereafter put into a Chapter 11 Bankruptcy wherein LTL and other J&J entities sought the protection of the Bankruptcy Code's processes and machinery to obtain a stay of all pending litigation and construct an aggregate resolution of its outstanding present and future asbestos liabilities that would foreclose jury trials and reduce the compensation they would owe to those harmed by its PRODUCTS and their families, given that J&J and its subsidiaries were increasingly being held liable by juries in lawsuits brought by talc asbestos claimants and were being ordered to pay compensatory and exemplary damages.

28.     As part of J&J's liability avoidance/limiting corporate restructuring, all of the productive assets of Old JJCI, including those used to manufacture and market J&J Baby Powder, were transferred to a newly minted corporate entity named "Johnson & Johnson Consumer Inc." ("New JJCI"). New JJCI upon receipt of the Old JJCI's operating assets continued to sell J&J Baby

9

Powder, as had Old JJCI previously before when J&J itself directly marketed the product line through an internal division.

29.    Over the objection of tens of thousands of personal injury and wrongful death tort plaintiffs, the Bankruptcy Court presiding over LTL's 2021 bankruptcy case stayed and enjoined prosecution of all litigation against not only the Debtor LTL but all cosmetic talc injury related litigation involving J&J and New JJCI.

30.    During LTL's bankruptcy proceedings, representatives of the affected personal injury and wrongful death tort victims challenged J&J's Texas Two Step scheme before the Bankruptcy Court.  After losing their challenges before the Bankruptcy Court, they were ultimately successful on appeal before the United States Court of Appeals for the Third Circuit, which on January 30, 2023, ruled that the Bankruptcy filing by LTL was not proper and ordered that LTL's 2021 Bankruptcy case be dismissed. *In re: LTL Management, LLC*, No. 22-0007, 2023 WL 2760479 (3d Cir., decided Jan. 30, 2023; opinion entered Mar. 31, 2023).

31.    LTL's efforts to obtain re-argument before the Third Circuit panel hearing its appeal or an *en banc* hearing were denied, and the Appeals Court's mandate to the Bankruptcy Court was issued by the Third Circuit Clerk on March 31, 2023, thereby triggering the lower court's duty to enter an order dismissing the case.

32.    Within hours of the LTL Bankruptcy Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court seeking the same relief as in the dismissed case, claiming its funding sources and arrangements had been replaced and reconfigured in such way that purportedly overcame the Third Circuit's reasons for ordering the earlier bankruptcy case be dismissed.

33.    On July 28, 2023 the Bankruptcy Court presiding over LTL's second bad faith attempt at bankruptcy was dismissed.

34.    Unbeknownst to plaintiffs, during the time the Third Circuit Court of Appeals was considering the propriety of LTL's bankruptcy filing, New JJCI began the process of moving its assets and business to yet another J&J subsidiary, Defendant Kenvue, Inc., by transfers through JJCI's direct parent, Janssen Pharmaceuticals, Inc.

35.    According to the Kim Declaration, as part of J&J's further corporate restructuring, New JJCI changed its name to "Johnson & Johnson Holdco (NA) Inc." ("Holdco"), a New Jersey corporation. His declaration before the Bankruptcy Court additionally revealed that "in early January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity." *See* Kim LTL Decl. at ¶26.

36.    While Mr. Kim's declaration does not expressly state who the parent entity is, a careful examination of the affidavit demonstrates that Janssen Pharmaceuticals, Inc, is the parent entity of Defendant New JJCI. *Id.* Figure 1 below is from an Exhibit to Mr. Kim's Declaration and



Figure 1

11

shows that Janssen is the parent that received all of the JJCI assets used to manufacture, market, and sell J&J Baby Powder.

37.    Accordingly, under Florida law, Holdco, Janssen and LTL, JJCI2 and JJCI3 are successors to Old JJCI and responsible for the contractual undertakings and tortious conduct of Old JJCI. In December 2023, LTL Management LLC changed its name to LLT Management LLC.

38.    The information gleaned from Mr. Kim's Declaration and a J&J subsidiary's SEC filings shows that J&J is in the process once again of manipulating assets and responsibilities related to the sale of J&J's Baby Powder.

39.    On January 4, 2023, Defendant Kenvue, another J&J subsidiary, submitted its first filing with the Securities and Exchange Commission ("SEC"), an S-1 registration of securities form. Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023). Figure 2 below reproduces a portion of the filing's cover page.

Figure 2



40.    In its SEC registration filing, Kenvue sets forth the products that it claims to manufacture and sell in the United States. In this regard, Kenvue represented to the SEC and the public: "A number of **our products marketed in the United States,** including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and Cosmetic Act and the Fair Packaging and Labeling Act. **Our**

12

**cosmetic products include** Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, **Johnson's Baby Powder** and certain of our Listerine mouthwash products." *Id.* (emphasis added).

41.     Kenvue acknowledged in its SEC S-1 filing that it may be held accountable for the harm caused by the talc-based PRODUCTS it is responsible for: "It is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." *Id.*

42.     Kenvue further acknowledges itself as the company responsible for the manufacture of Johnson's Baby Powder indicating that it "may be subject to additional claims . . . related to the sale of talc-based Johnson's Baby Powder in markets where we have discontinued this product (such as in the United States and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." *Id.* (emphasis added).

43.     Kenvue also acknowledges that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada." *Id.*

44.     As such, Kenvue is responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc PRODUCTS to which the Decedent was exposed.

45.     During an October 17, 2023 earnings call, Johnson & Johnson's head of litigation announced that it was considering filing a third bankruptcy in an effort to resolve the pending talc litigation.

46.     On May 1, 2024, Johnson & Johson announced its intention to solicit votes on a

third, prepackaged bankruptcy plan. Following a three-month solicitation of votes, Johnson & Johnson again used the "Texas Two-Step" maneuver and directed that its new subsidiary, Red River Talc LLC, file bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.

47.    Following a two-week trial in February 2025, Judge Christopher Lopez dismissed the Red River Talc bankruptcy on March 31, 2025, finding that dismissal was proper due to numerous voting irregularities and the improper inclusion of third-party releases in Red River's proposed bankruptcy plan. *See* Dismissal Order, *In re Red River LLC*, No. 24-90505, Order at 12 (March 31, 2025).

48.    In its dismissal order, the Bankruptcy Court described the 2024 restructuring transactions that were intended to end LLT and create Red River Talc LLC as follows:

a.    "The 2024 corporate restructuring proceeded in the following steps. First, Holdco was converted from a New Jersey corporation to a new Texas LLC named J&J Holdco (NA) LLC ("Holdco (Texas)"). Next, LLT was merged into Holdco (Texas), with Holdco (Texas) being the surviving entity. Lastly, there was a divisional merger of Holdco (Texas) where Holdco (Texas) ceased to exist and the assets and liabilities of Holdco (Texas) were allocated to three new Texas LLCs." *Id.*

b.    One of those is Red River, which was supposedly allocated the talc-related ovarian and other gynecological cancer liabilities. *Id.*

**B. DEFENDANTS CONTINUE THE BUSINESS OF JJCI, INCLUDING THE JOHNSON'S BABY POWDER PRODUCT LINE**

49. The bottle for the cornstarch-based formulation Johnson's® Baby Powder, which is sold today in the United States, states: "For over 125 years JOHNSON's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!"

50. The bottle for the cornstarch-based formulation Johnson's® Baby Powder, which is sold today in the United States, states: "For over 125 years JOHNSON's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!"

Figure 3



51. Kenvue admits in its SEC filing that while J&J transitioned to a cornstarch-based formula for Johnson's® Baby Powder in the United States and Canada in 2020, it is still distributing talc-based Johnson's® Baby Powder in other markets and continued to do so until sometime in 2023. *Id.* at 63, 330.

52. It remains possible today, through Amazon's online shopping website, to purchase talc-based Johnson's Baby Powder and have it delivered to New Jersey. (Transcript of Motions May 24, 2023, Naranjo, et. al., v. Johnson & Johnson, et al., Vol. 1 of 2, at 44:18-45:10).

53. Kenvue's website lists Johnson's as one of its "iconic brands" under the categories

15

of "Skin health & Beauty – Face & body" and "Essential health – Baby care". https://www.kenvue.com/brands.

54.    Following the link to the Johnson's brand page, one finds Johnson's Baby Powder, amongst a variety of baby care products. https://www.johnsonsbaby.com/baby-products. On Kenvue's Johnson's brand website's FAQ page, under the questions "Why did Johnson's® reformulate?" and "How have the Johnson's® products changed?" Kenvue indicates it has generally reformulated its line of Johnson's baby products recently based on its continued scientific research and input from parents. *See* https://www.johnsonsbaby.com/faq#why-did-johnson-s-reformulate; https://www.johnsonsbaby.com/faq#how-have-the-johnson-s-products-changed. As with its corn-starch-based Johnson's Baby Powder, Kenvue continues to market these reformulated products under the trusted Johnson's brand name. Kenvue's CEO, Thibaut Mongon, has testified that "most" of the "employees of Consumer Health transferred from Johnson & Johnson to Kenvue" including "all the employees involved in the manufacturing and marketing of Johnson's Baby Powder[.]" *See* August 14, 2023 Tr. of Mr. Mongon at 44:11-19, 45:17-21.

55.    Mr. Mongon also testified that "all the manufacturing assets involved in Johnson's Baby Powder transferred from Johnson & Johnson to Kenvue," *id.* at 45:22-25, and that there was no "interruption or disruption to the business[.]" *Id.* at 158:21 to 159:14.

56.    According to Mr. Mongon, Kenvue also obtained the "right to use Johnson's trademark going forward," *id.* at 46:1-12, and that the "Johnson's Baby brand is part of the Kenvue portfolio." *Id.* at 45:1-2.

57.    Janssen, JJCI 3, and Janssen are thus responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc PRODUCTS to which Decedent was exposed.

16

**FACTUAL ALLEGATIONS**

A. **OVERVIEW OF TALC AND PRODUCTS**

58.     Talc is an inorganic magnesium silicate mineral that may occur in a variety of forms (massive or platy, foliated, and fibrous).

59.     Talc is used in a wide array of industrial, commercial, and cosmetic substances. It is the main substance in talcum powders, talc-based body powders, and the PRODUCTS.

60.     Talc is mined from deposits in the earth that can contain asbestos, heavy metals (nickel, cadmium, cobalt, chromium, arsenic, etc.), and other toxic minerals.

61.     Defendants acting as aforesaid manufactured and marketed Johnson's Baby Powder ("JBP") and Shower to Shower.

62.     J&J began the manufacture of Johnson's Baby Powder in approximately 1894.

63.     In the late 1970s, J&J incorporated a new division that over several name changes became Johnson & Johnson Consumer Inc. ("JJCI"), which sold Johnson's Baby Powder.

64.     Although JJCI manufactured and marketed the product, starting in the late 1970s, J&J was involved in critical decisions concerning safety and health including marketing, public relations, interaction with federal authorities, fraudulent concealment, and the refusal to warn people like the Decedent that J&J's talc PRODUCTS were capable of causing cancer.

65.     J&J in conjunction with and as the authorized spokesperson, representative and agent for Defendants made representations to federal authorities and the consuming public concerning the safety of Defendants' PRODUCTS.

66.     Defendants and J&J, at all times relevant hereto, represented to consumers, doctors, regulators, and courts that JBP and other talc PRODUCTS were safe and free of asbestos.

67.     During all relevant times, JBP was composed primarily of talc along with other

17

constituent elements found in talc such as asbestos, fibrous talc, heavy metals (e.g., nickel, cadmium, cobalt, chromium, arsenic), and fragrance chemicals.

68.     The Defendants obtained the talc for Johnson's Baby Powder and other talc PRODUCTS from various sources including Guangxi, China, the Fontana mine in the Germanasca Valley and Val Chisone region in Italy, as well as the Johnson, Hammondsville, Rainbow, Hamm, and Argonaut mines in Vermont (collectively referred to as "Vermont mines"). *See* 2/15/2019 Deposition of Musco 63:7-64:5 (Hammondsville and Johnson mines were sources of cosmetic talc for Johnson's Baby Powder); *see also* 3/8/2019 Deposition of Nancy Musco 451:2-453:22 (Emtal 500 from Johnson Mine used in Cosmetics); 10/29/1982 Deposition of Roger Miller; 7/22/2019 Trial Testimony of John Hopkins *Barden et al. v. Johnson & Johnson* at 18:15-19:21.

69.     From approximately 1967 until 2003, the primary source of talc for the PRODUCTS was Vermont mines including the Hammondsville, Rainbow, Hamm, and Argonaut mines. The mines were owned and operated by J&J's subsidiary, Windsor Minerals, with J&J exercising control over all key decisions concerning the mines.

70.     Over time, the trade names for the talc ore used by J&J and the Defendants in Johnson's Baby Powder and Shower to Shower included "Emtal," "Grade 66," "Grade 96," "1615," "Italian 00000," and "Supra," all of which contain asbestos.

71.     At all relevant times, a feasible and safe alternative to talc has existed. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness as talcum powders. *See* Johnson & Johnson Baby Powder Questions and Answers, October 1985 (JNJ 000011777); cornstarch "can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc." November 3, 1964

18

Letter to Ashton from Stalker (JNJ 000332195); *see also* Johnson's Baby Powder, pure cornstarch, being marketed as "a change for the better."

72.     At relevant times, J&J and the Defendants advertised and marketed their "Johnson's Baby Powder" product as a symbol of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" to keep skin feeling dry and comfortable, and "clinically proven gentle and mild." J&J and the Defendants induced people through advertisements to dust themselves with this product to mask odors. Johnson's Baby Powder bottle specifically targets women, stating: "For you, use every day to help feel soft, fresh, and comfortable." *See* P-121 (excerpts from www.johnsonbaby.com and www.showertoshower.com); Shower to Shower Task Force – BP Brainstorm July 14, 2004 (JNJ 000058760); P-49 (picture of Johnson & Johnson's Baby Powder bottle).

73.     Although the labels on the bottles for J&J Baby Powder have changed over time, the core message has been the same: that people can safely use the PRODUCTS on their bodies.

**B.  STRONG EVIDENCE LINKS TALC USE TO OVARIAN CANCER**

74.     In a 1948 paper, J&J scientists recognized talc as a hazard to human health. Eberl et al., *Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves*, 25 Am. J. Surgery 493 (1948).

75.     As early as 1961, research established that some particles, including particles like talc, can translocate from the exterior genital area to the ovaries in women. Egli & Newton, *The Transport of Carbon Particles in the Human Female Reproductive Tract*, 12 Fertility Sterility 2 (1961).

76.     In 1964, J&J admitted in an internal company document that talc could not be safely absorbed by the vagina while cornstarch could be. *See* P-343 (JNJ 000265536 at p. 3) (cornstarch

19

"replaced talc because [cornstarch]. . . was found to be absorbed safely in the vagina whereas, of course, talc was not"); *see also* JNJ 000331979 (cornstarch "can be absorbed into the body, tending not to cause severe granuloma as may be the case with talc.").

77.     Beginning in the 1970s, J&J had in its possession published scientific literature detailing specific cases involving consumers who developed extensive talcosis as a result of the liberal use of cosmetic powder. *See* 11/28/2018 Deposition of Nancy Musco at 107:12-109:10.

78.     There is no dispute that for over half a century, there have been serious questions about whether talcum powder can cause cancer. For example, JJCI's Chief Medical Officer, Edwin Kuffner MDL testified in 2021 that:

> Q And you would agree for at least a half century before you became CMO for Old JJCI in 2017 there were questions raised in the medical and scientific community about the safety of talcum powder, true?
>
> A Yes.[1]

79.     In fact, as early as 1973, proposals were made to Congress to both study the link of talc and ovarian cancer and replace talc as a cosmetic used for feminine hygiene. *See* Toxic Substances Control Act of 1973 hearings before the U.S. Senate (February 23, 1973). For example, because of studies finding talc in the ovaries of women with ovarian cancer, it was noted that "Some area which requires immediate investigation should be talcum powder and vaginal deodorants." *Id.* at 170. Indeed, at those 1973 Senate Hearings, the lack of studies demonstrating the safety of talc for women was specifically linked to Johnson's Baby Powder:

> Before 1895, when Johnson and Johnson began talc manufacture, babies were commonly dusted with com starch; this safe substitute is still available, and at one-fourth the cost of talc. We recommend it. Don't use feminine hygiene sprays which contain talc.

---

[1] Deposition of Ed. Kuffner, *In re: LTL Management LLC*, at 417.

80.    In or about 1971, the first study was conducted that suggested an association between talc and ovarian cancer. This study was conducted by Dr. W.J. Henderson and others in Cardiff, Wales. *See* Henderson, WJ, et al., *Talc and carcinoma of the ovary and cervix*. Journal of Obstetrics and Gynaecology of the British Commonwealth. March 1971. Vol. 78. pp. 266-271.

81.    In internal documents, J&J acknowledged over the course of decades, its recognition of and notice of the talc/ovarian cancer issue and that "if the results of any scientific studies show any question of safety of talc" use, J&J would "not hesitate to take it off the market." *See* Memo to File January 18, 1974 "Meeting with Commissioner Schmidt FDA" P-660 (JNJ000488208); P-55 (JNJ000026241); "Talc and Ovarian Cancer Supplementary questions and answers Prepared 20.10.97" P-115 (JNJ000024495).

82.    In or about 1979, migration of particulates from the vagina to the peritoneal cavity and ovaries was found, correlating previous findings in surgically removed specimens. *See* JNJ 000005093.

83.    Upon information and belief, in or about 1982, the first epidemiologic study was performed on talc powder use in the female genital area. This study was conducted by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use. Upon information and belief, shortly after this study was published, Dr. Bruce Semple of J&J visited Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that J&J should place a warning on its talcum powder products about the ovarian cancer risks so that women could make an informed decision about their health. Cramer, D., et al. "Ovarian Cancer and Talc." Cancer 50:372-376 (1982).

84.    A J&J Technology Forecast, dated 1986, acknowledged that safety of cosmetic powders was a concern and that health professionals had decided that powders provide no health

21

benefit. The document also acknowledged that "Retrospective studies have implicated talc use in the vaginal area with the incidence of ovarian cancer." *See* "Technological Forecast Powders" P-9 (JNJ00000523).

85. Since publication of the Cramer study in 1982, there have been dozens of additional epidemiologic studies and other scientific studies providing data regarding the association of talc and ovarian cancer. Nearly all of these epidemiology studies have reported an elevated risk for ovarian cancer associated with genital talc use in women. Significantly, scientific studies have provided biologically plausible explanations as to how genital talc use can cause ovarian cancer:

a. In 1983, a case-control study found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P., *et al.* Talc and Ovarian Cancer. *JAMA*. 1983; 250(14):1844.

b. In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the genital area before their cancer diagnosis. The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their genital area and the relative risk for talc use between 1 and 9 years, relative to a shorter duration, was 1.6 (p = 0.05). Whittemore AS, *et al.* Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee. *Am. J. Epidemiol.* 1988 Dec; 128(6):1228-40.

c. A 1989 study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once each week. Booth, M., *et al.*

22

Risk factors for ovarian cancer: a case-control study. *Br J Cancer*. 1989 Oct; 60(4):592-8.

d.  In 1992, a case-control study found an 80% increased risk of ovarian cancer in women with more than 10,000 lifetime perineal applications of talc, demonstrating a positive dose-response relationship. Harlow BL, *et al.* Perineal exposure to talc and ovarian cancer risk. *Obstet Gynecol.* 1992 Jul; 80(1):19-26.

e.  Another 1992 case-control study reported a 70% increased risk from genital talc use and a 379% significantly increased risk of ovarian cancer in women who used talc on sanitary napkins in their genital area. Rosenblatt, K.A. *et al.* Mineral fiber exposure and the development of ovarian cancer. *Gynecol Oncol.* 1992 Apr; 45(1):20-5.

f.  Yet another 1992 case-control study by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. Yong Chen, *et al.*, Risk Factors for Epithelial Ovarian Cancer in Beijing, China, 21 *Int. J. Epidemiol.* 23-29 (1992).

g.  In 1995, the largest study of its kind to date found a 27% increased risk in ovarian cancer for women who regularly use talc in the abdominal or perineal area. Purdie, D., *et al.* Reproductive and other factors and risk of epithelial ovarian cancer: An Australian case-control study. Survey of Women's Health Study Group. *Int J Cancer.* 1995 Sep 15; 62(6):678-84.

h.  In 1996, a case-control study found a statistically significant 97% increased risk of

ovarian cancer in women who used what they described as a "moderate" or higher use of talc-based powders in their genital area. *See* Shushan, A., *et al.* Human menopausal gonadotropin and the risk of epithelial ovarian cancer. *Fertil. Steril.* 1996 Jan; 65(1):13-8.

i.  In 1997, a case-control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area. Women who performed any perineal dusting or used genital deodorant spray respectively had a statistically significant 60% to 90% higher risk of developing ovarian cancer. Cook, LS, *et al.* Perineal powder exposure and the risk of ovarian cancer. *Am. J Epidemiol.* 1997 Mar 1; 145(5):459-65.

j.  In 1997, a case-control study involving over 1,000 women found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc directly or via sanitary napkins to their perineal area. Chang, S, *et al.* Perineal talc exposure and risk of ovarian carcinoma. *Cancer*. 1997 Jun 15; 79(12):2396-401.

k.  In 1998, a case-control study found a 149% increased risk of ovarian cancer in women who used talc-based powders on their perineal area. Godard, B., *et al.* Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study. *Am J Obstet Gynecol.* 1998 Aug; 179(2):403-10.

l.  Dr. Daniel Cramer conducted another case-control study in 1999, observing 563 women newly diagnosed with epithelial ovarian cancer and 523 women in a control. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineal area and an 80%

24

increase in risk for women with over 10,000 lifetime applications. Cramer, DW, *et al.* Genital talc exposure and risk of ovarian cancer. *Int J Cancer.* 1999 May 5; 81(3):351-56.

m. In 2000, a case-control study including over 2,000 women found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. Ness, RB, *et al.* Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer. *Epidemiology.* 2000 Mar; 11(2):111-7.

n. In 2004, a case-control study of nearly 1,400 women from 22 counties in Central California found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use and a 77% increased risk of serous invasive ovarian cancer from women's genital talc use. Importantly, this study also examined women's use of cornstarch powders as an alternative to talc and found no increased risk of ovarian cancer in women in the cornstarch group, supporting a safe alternative to talc for genital use. Mills, PK, *et al.* Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California. *Int J Cancer.* 2004 Nov 10; 112(3):458-64.

o. In a 2007 study by Buz'Zard, *et al.*, talc was found to increase proliferation, induce neoplastic transformation, and increase reactive oxygen species (ROS) generation time-dependently in the ovarian cells. The study concluded that talc may contribute to ovarian carcinogenesis in humans. The data suggested that talc may contribute to ovarian neoplastic transformation and Pycnogenol reduced the talc-induced transformation. *Phytotherapy Research: PTR* 21, no. 6 (June 2007): 579–86.

p. In 2008, a combined study of over 3,000 women from a New England-based case-

25

control study found a 36% statistically significant increased risk for all types of epithelial ovarian cancer from genital talc use and a 60% increased risk of the serous invasive ovarian cancer subtype. The study also found a highly significant dose-response relationship between the cumulative talc exposure and incidence of ovarian cancer (and all serous invasive ovarian cancer), adding further support to the causal relationship. Gates, MA, *et al.* Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. *Cancer Epidemiol Biomarkers Prev.* 2008 Sep; 17(9):2436-44.

q.  A 2009 case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use, with an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. That increased risk rose dramatically, to 108%, in women with the longest duration and most frequent talc use. Wu, AH, *et al.* Markers of inflammation and risk of ovarian cancer in Los Angeles County. *Int. J Cancer.* 2009 Mar 15; 124(6):1409-15.

r.  In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use. Rosenblatt, KA, *et al.* Genital powder exposure and the risk of epithelial ovarian cancer. *Cancer Causes Control.* 2011 May; 22(5):737-42.

s.  In June of 2013, a pooled analysis of over 18,000 women in eight case-control studies found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders

may be a possible strategy to reduce ovarian cancer incidence." Terry, KL, *et al.*
Genital powder use and risk of ovarian cancer: a pooled analysis of 8,525 cases and
9,859 controls. *Cancer Prev Res (Phila).* 2013 Aug; 6(8):811.

t.   In May 2015, Roberta Ness performed a meta-analysis of all accumulated
epidemiologic evidence (23 case-control studies, 5 meta-analyses, and 3 analyses
of a single cohort). Talc use was found to increase ovarian cancer by 30-60% in
almost all well-designed studies. The results were published in the International
Journal of Gynecological Cancer. Ness, R. Does talc exposure cause ovarian
cancer? Intl. J. Gyn. Cancer. 25 Supp. 1 (May 2015): 51.

u.   Also in 2015, Cramer, *et al*. performed a retrospective case-control study. Overall,
genital talc use was associated with an OR (95% CI) of 1.33 (1.16, 1.52), with a
trend for increasing risk by talc-years. In addition, subtypes of ovarian cancer more
likely to be associated with talc included invasive serous and endometrioid tumors
and borderline serous and mucinous tumors. Premenopausal women and
postmenopausal HT users with these subtypes who had accumulated greater than
24 talc-years had ORs (95% CI) of 2.33 (1.32, 4.12) and 2.57 (1.51, 4.36),
respectively. Epidemiology (Cambridge, Mass.), December 17, 2015.

v.   A 2016 study of African-American women found that body powder was
significantly associated with Epithelial Ovarian Cancer ("EOC"). Genital powder
was associated with an increased risk of EOC (OR = 1.44; 95% CI, 1.11–1.86) and
a dose-response relationship was found for duration of use and number of lifetime
applications ($P < 0.05$). The study concluded that body powder is a modifiable risk
factor for epithelial ovarian cancer among African-American women. Schildkraut

27

JM, et al. Association between Body Powder Use and Ovarian Cancer: the African American Cancer Epidemiology Study (AACES). Cancer epidemiology, biomarkers & prevention: a publication of the American Association for Cancer Research, cosponsored by the American Society of Preventive Oncology. *Cancer Epidemiol Biomarkers Prev.; 25(10); 1411–7.*

w.  A 2016 study examined 2,041 cases with epithelial ovarian cancer and 2,100 age-and-residence-matched controls. Genital use of talc was associated with a 1.33 OR with a trend for increasing risk by years of talc use. Most women in the study reported using J&J's Baby Powder and Shower to Shower. Among epidemiologic variables, no confounders for the association were identified. Cramer DW, et al. The association between talc use and ovarian cancer: a retrospective case-control study in two US states. *Epidemiology*. 2016; 27, 334-46.

x.  In 2018, two meta-analyses were published. These meta-analyses, which combined prior epidemiological studies, concluded that the use of talcum products increased the risk of ovarian cancer. *See* Penninkilampi, Ross, and Guy D. Eslick. *"Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis."* Epidemiology (Cambridge, Mass.) 29, no. 1 (January 2018): 41–49; *see also* Berge, Wera, et al. *"Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis."* European Journal of Cancer Prevention, January 2017, 1.

y.  In 2018, Saed, et al. found that talc affects the redox state in human ovarian cells, a known biological pathway to cause cancer. The scientists concluded that this study demonstrated a cellular biological mechanism of how talc causes ovarian cancer. *See* Fletcher, NM, et al. *"Molecular Basis Supporting the Association of*

28

*Talcum Powder Use with Increased Risk of Ovarian Cancer."* Reproductive Sciences 1-10 (2019).

z.   In 2019, Taher et al. published a systematic review of the evidence linking talcum powder to ovarian cancer. This study concluded that "talc is a possible cause of cancer in humans based on the totality of evidence from multiple observational studies and a plausible biological pathway including chronic inflammation and oxidative stress." Taher et al., *Critical Review of the Association between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicology 88, 99 (2019).

aa.  In 2020, O'Brien, et al. published a pooled study in the Journal of American Medical Association (JAMA). The O'Brien investigators pooled data from the three (3) cohort studies: Nurse's Health Study I and II (NHS), Women's Health Initiative (WHI), and the Sisters' Study. This study included 252,745 subjects with a total of 1,884 medically confirmed ovarian cancers. The authors acknowledged the direct physical pathway between exposure of talcum powder to the genital area and the fallopian tubes and ovaries. There was a significantly elevated risk found in women with patent (open) reproductive tracts (RR 1.13; CI 1.01-1.26). In addition, a statistically significant increased risk of 19% was noted in frequent users (at least weekly) (RR 1.19 (1.03-1.37)). O'Brien et al., Association of Powder Use in the Genital Area with Risk of Ovarian Cancer. 323 *JAMA* 49 (2020); O'Brien et al., Supplementary Online Content (2020).

bb.  In 2022, Woolen, et al. published a meta-analysis of 10 case-controlled studies and a single cohort study which focused on the frequent use of genital use of talcum

29

powder, defined as at least two times per week. The study included 66,876 patients and 6,542 ovarian cancer cases. Frequent talcum powder use was associated with an elevated risk of ovarian cancer of 47% (adjusted pooled summary odds ratio 1.47 (95% CI 1.31, 1.65, P<0.0001)). Woolen, SA, et al., Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: a Systematic Review and Meta-analysis. J Gen Intern Med. Aug;37(10): 2526-2532. (2022).

cc. In 2024, O'Brien, et al. published data from the Sister Study, a cohort study involving 50,884 women who had a sister with breast cancer. "[G]enital use of talcum powder was positively associated with ovarian cancer (HR range, 1.17-3.34)." With recall bias correction, the Hazard Ratio for long-term users of talc was 2.01 (1.39 to 2.91); for frequent users 1.81 (1.29 to 2.53); for women who used in their 20s 1.88 (1.37 to 2.57); and for women who used in their 30s 2.08 (1.50 to 2.89). O'Brien, K., et al., *Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*. J. Clin. Oncol. 2024 Aug 1;42(22):2645-2659.

dd. In addition, over the past four decades, there have been numerous animal and human ovarian cell studies that show talc is harmful and can increase the risk of developing ovarian cancer.

86. Although questions of safety raised about the PRODUCTS have persisted since the 1970's, J&J and Defendants did not adequately study whether these products, which it advertised for feminine hygiene, could cause ovarian cancer.

87. In fact, it is believed that the Defendants spent less than $5,000 over a half century

to study this important issue. The only study ever supported by J&J was a 1995 study, Gross & Berg, *A Meta-Analytical Approach Examining the Potential Relationship Between Talc Exposure and Ovarian Cancer*, 5 J. Exposure Analysis Environ. Epi. 181 (1995). And that study urged that additional studies be conducted on this important issue. In that study, the authors concluded that "…the results of this metanalysis do suggest the possibility of an increased risk of ovarian cancer and perineal talc use. ***Further research is warranted by these results.***" Gross & Berg at 193 (emphasis added).

88.     Even though the onus of proving safety or studying risk rested with J&J and the Defendants, the potential risk of cancer was raised in the medical and scientific literature, and the Gross & Berg study said, "additional studies are warranted," J&J and Defendants did not commission additional studies to prove safety or study the potential risk of ovarian cancer—even those which were suggested by their own scientists. By way of example, in 1995, the very same year that the Berg and Gross Study was published, J&J scientists recommended that "J&J sponsor a new, highly structured epidemiology study focused to examine the possibility that cosmetic talc use can lead to increased risk of ovarian cancer." That study was proposed by Joshua Muscat, MD, an epidemiologist consultant retained by J&J and would have cost less than $400,000. JNJ 000000082.

89.     The J&J scientists described the proposed Muscat study as one which should "replace all others as the definitive treatise on this issue." *Id.* Despite being recommended by J&J scientists, this 1995 "definitive" study was inexplicably never funded. The committee that considered the proposal included J&J's product liability attorney, John O'Shaughnessy. When asked whether J&J ever gave a reason for not funding his definitive ovarian cancer study, Dr. Muscat stated that he was never given an explanation: "There was obviously a point where we

31

knew it was not going to be funded so…" *See* 9/25/2015 Deposition of Joshua Muscat at 101:1-25.

90.     The 1995 "definitive" Muscat study was only one example of studies that were not performed by J&J on the important question of whether the PRODUCTS could cause ovarian cancer. Although there were multiple opportunities to study whether talc could migrate to the ovaries and cause ovarian cancer over half a century, J&J and Defendants did not perform their own study or commission any other studies.

91.     In or about 1993, the United States National Toxicology Program published a study on the toxicity of non-asbesti from talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. *See* NTP Technical Report on the Toxicology and Carcinogenesis Studies of Talc (1992) P-11 (JNJ000008945).

92.     In 2012, J&J sold Shower to Shower to Valeant Pharmaceuticals n/k/a Bausch Health Co. Inc. In 2019, Bausch Health announced that it had reformulated Shower to Shower to replace the talc in the product with cornstarch.

93.     In 2016, J&J registered Baby Powder under the California Safe Cosmetics Act. This law was established to compel cosmetic manufacturers to register ingredients that are "known" or "suspected" carcinogens.

94.     In December 2018, Health Canada published a draft screening assessment on the safety of talc. The comprehensive scientific assessment included a Bradford Hill analysis of relevant epidemiological and animal studies.  Health Canada concluded that there is a "statistically significant positive association between perineal exposure to talc and ovarian cancer" and "available data are indicative of a causal effect." (JNJTALC001094046).

95.     In April 2021, Health Canada confirmed its draft finding and issued its final

32

screening assessment. In its final assessment, Health Canada concluded: "With regards to perineal exposure, analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect." (Health Canada, *Screening Assessment*, at iii (April 2021).

96.     In July 2024, IARC announced that a Working Group of 29 scientists had classified talc, including lamellar and fibrous (which includes asbestiform fibres), as probably carcinogenic to humans (Group 2A).  The finding was based on limited evidence in humans due to uncertainty if asbestos was present in talc, sufficient evidence for cancer in experimental animals, and strong mechanistic evidence that talc "exhibits key characteristics of carcinogens in human primary cells and experimental systems."  IARC noted that talc containing asbestos is carcinogenic to humans (Group 1) and that there is sufficient evidence that asbestos causes cancers of the ovary. "IARC Monographs evaluate carcinogenicity of talc and acrylonitrile" IARC Vol. 136, Questions and Answers (July 5, 2024).

## C.  ASBESTOS AND OTHER CONSTITUENTS IN TALC

97.     The PRODUCTS contain asbestos and fibrous talc, and Defendants failed to warn the public, including Decedent, about the fact that the PRODUCTS contained such carcinogenic substances.

98.     Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos. Over the next several decades, a growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease,

cancer, and death.

99.    The United States Geological Survey on Commercial Talc Production conducted in 1965, as well as those dating back to the 1800s, noted the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

100.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits like those mined by Defendants for use in the PRODUCTS. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that these positive results or the brand names of contaminated PRODUCTS were communicated to any governmental agency, the media, or the public. The study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 29 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968).

101.    In 1971, the New York City Environmental Protection Administration Air

34

Resources Board conducted a study of two "leading" brands of talcum powder using transmission electron microscopy ("TEM") and X-ray diffraction analysis ("XRD") and found them to contain 5-25% tremolite and anthophyllite asbestos fibers.

102.     A 1976 follow-up study of commercially available talcum products concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J. Tox. Envtl. Health 255-284 (1976).

103.     In 1981, Lockey, in *Nonasbestos fibrous materials* (1981), reported that talc frequently exists in complex deposits containing quartz and asbestos and that talc free from asbestos also contains talc in fibrous form.

104.     Paoletti et al. *Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial,* Cosmetic*, and Pharmaceutical Talcs* (1983), analyzed talc powders from national and international markets in order to assess their fiber contents and the proportion of asbestos in the fibrous material. Analysis of talcum powder samples revealed that the powders contained fiber content up to 30% of total particles. About half of the talc powders revealed the presence of asbestos.

105.     In 1991, Alice Blount tested talcum powder mined from Vermont, including Johnson's Baby Powder, and found that the powder contained asbestos fibers and needles. Blount, A. M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs." *Environmental Health Perspectives* 94 (August 1991): 225–30; *see also* 4/13/2018 Deposition of Alice Blount at 30:16-33:8, 47:15-25.

35

106.    On November 14, 2018, Drs. William Longo and Mark Rigler published a report detailing results from tests they performed on samples of J&J talc PRODUCTS provided by the J&J Defendants dating from the 1960s to the early 2000s. 68% of the samples tested contained amphibole asbestos. The authors further found that 98% of the samples contained fibrous talc.

107.    In 2019, the U.S. Food and Drug Administration ("**FDA**") contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder. AMA identified chrysotile asbestos and talc fibers in a sample of Johnson's Baby Powder. As a result, Johnson & Johnson Consumer Inc. issued a recall of all bottles (approximately 33,000) from the sampled lot.

## D.  EVIDENCE OF ASBESTOS IN DEFENDANTS' PRODUCTS

108.    Beginning at least in the 1950s, J&J tested its talc for contaminant or co-minerals, including "asbestos" and "tremolite," because the company knew they are deleterious minerals that could be harmful to a person's health and thus should not be found in talc-based cosmetic products.

109.    At all times relevant hereto, J&J and Defendants understood the dangers posed by asbestos exposure and that asbestos was a known contaminant of talc used in cosmetic and industrial products.

110.    All information known to J&J concerning the hazards of asbestos-containing talc was shared with and known by the Defendants.

111.    Internally, J&J historically defined "asbestos" as "the fibrous serpentine chrysotile and the fibrous forms of … anthophyllite, … tremolite, and actinolite." *See* 4/16/2018 Deposition of John Hopkins 174:24-175:23.

112.    In addition to conducting its own internal tests described above, J&J hired testing

36

laboratories, such as the Battelle Memorial Institute, McCrone Associates, the Colorado School of Mines Research Institute, and others to test for asbestos contamination (or co-mineralization) in the source talc ore used to manufacture Johnson's Baby Powder and J&J cosmetic products.[2]

113.    All of these testing laboratories found asbestos minerals both in the source talc ore and J&J's cosmetic talc products.[3]

114.    Testing done by J&J, Defendants, and their consultants in the 1960s, 1970s, 1980s, and 1990s demonstrated that there was asbestos in the talc mined from J&J's Vermont mines.

115.    Contaminants satisfying J&J's and Defendants' own definition of asbestos have been found in J&J talc, include "chrysotile," "tremolite," "anthophyllite," and/or "actinolite." *See, e.g.*, 12/4/1970 Colorado School of Mines Institute testing results; 6/30/1971 Colorado School of Mines Institute testing results; *Barden* Trial Ex. P3695-082-86: Summary chart of testing of Johnson's Baby Powder detecting asbestos and asbestos minerals.

116.    The existence of laboratory tests finding asbestos in J&J's cosmetic talc products

---

[2] *See, e.g.*, 4/12/1960 Battelle Memorial Institute report; 10/15/1957 Battelle Memorial Institute report; 5/23/1958 Battelle Memorial Institute report; 7/31/1959 Battelle Memorial Institute report; 8/31/1959 Battelle Memorial Institute report; 9/15/1959 Battelle Memorial Institute report; 12/31/1959 Battelle Memorial Institute report; 1/24/1968 Battelle Memorial Institute report; 5/9/1958 Battelle Memorial Institute report; 3/8/1960 Battelle Memorial Institute report; 6/6/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton summarizing observations of Smith Gouverneur, NY and Hammondsville, VT ore deposits, beneficiation products; 8/25/1961 Battelle Memorial Institute memo from W.L. Smith to W.H. Ashton evaluating exploration work on Hammondsville talc deposit.

[3] *See, e.g.* 4/14/1971, Colorado School of Mines Institute letter to Johnson & Johnson; 10/27/1972, McCrone report; 2/26/1973, Colorado School of Mines Institute to W. Ashton of Johnson & Johnson re: Mineralogical Exam of Five Talc Samples; 6/6/1973, Johnson & Johnson memorandum; 2/11/1974, McCrone to JJ Rolle; 4/10/1974, McCrone to JJ Russell; 4/24/1974, McCrone report; 4/27/1973, Microscopic Exam of Johnson's Baby Powder; 5/8/1974, McCrone report; 7/8/1974, McCrone to J.J. Rolle; 10/10/1974, McCrone to Windsor Minerals Inc.; 12/9/1974, McCrone to Johnson & Johnson; 7/1/1975, McCrone to Windsor Minerals Inc.; 8/31/1976, Johnson & Johnson Memo Re: Vermont 66 Talc; 9/11/1975, Stewart to V. Zeitz; 11/5/1975, McCrone to Windsor Minerals Inc.; 11/19/1975 McCrone to Windsor Minerals Inc.; 7/5/1976, Colorado School of Mines Research Institute report; 1/25/1977, F. Pooley to J.J. Rolle; 4/1/1977, EMV Report to Johnson & Johnson; 10/5/1978, McCrone to Windsor Minerals Inc.; 2/9/1979, handwritten notes regarding conversation with Harold Cohen; 11/6/1980, McCrone to Windsor Minerals Inc.; 8/22/1985, McCrone to Windsor Minerals Inc.; 4/29/1986, McCrone to Windsor Minerals Inc.; 3/25/1992, Johnson & Johnson Interoffice Memo by Munro; 12/4/1997, Bain Environmental Report; 5/23/2002, Luzenac America Inc. (hereinafter "Luzenac") Technical Report; 2/26/2004, Luzenac Product Certification Report; 2/27/2004 Luzenac - Product Certification; 3/4/2011, Summary of TEM Asbestos Results: Grade 66/96 USP Product Composites.

and source talc used in those products was verified by J&J under cross examination in recent litigation. *See* Trial Testimony of John Hopkins from *Barden et al v. J&J*, 8/14/19 at 148:17-21.

117.    As detailed in the following paragraphs, J&J executives acknowledged and communicated internally amongst themselves and with Defendants about the results of testing demonstrating the presence of asbestos in J&J's consumer talc products and the source ore used to make these products.

118.    In 1972 for example, J&J's Al Goudie confirmed that McCrone found trace tremolite and that these findings are "not new." *See* handwritten note from W. Nashed to Dr. Goudie.

119.    In May 1973, Roger Miller, the President of J&J's mining company, Windsor Minerals, informed Dr. Dewitt Petterson of J&J that "the ore body contains actinolite." *See* 5/1/1973 Memo from R.N. Miller to Dr. Petterson. This talc ore body was actively used to produce J&J's cosmetic talc products.

120.    One week later, J&J's William Ashton informed Dr. Petterson that "[t]he first showing of actinolite we know about is October 1972." *See* 5/8/1973 Memo from W. Ashton to D. Petterson.

121.    In April 1969, J&J discussed the need to firm up the company's position on tremolite in talc because of potential dangers to human health and safety noted in the medical literature and by environmental health agencies. *See* 4/9/1969 Ashton to Hildick Smith - Alternate Domestic Talc Sources File No. 101.

122.    J&J was concerned that the presence of tremolite in its cosmetic talc products, and thus, the resultant inhalation of talc with these needle-like crystalline structures, was related to the rising incidence of pulmonary diseases and cancer and increased the risk that the company would

38

be drawn into litigation relating to these diseases and cancer. *See* 4/15/1969 Thompson to Ashton - Alternate Domestic Talc Sources File No. 101.

123. In July 1971, J&J reported a conversation with Dr. Clark Cooper, a professor at the School of Public Health at the University of California, Berkley, who expressed his concern that there is no place for asbestos in talc and any talc with asbestos should be removed from the market. *See* 7/30/1971 Hildick Smith to R.A. Fuller. According to Dr. Cooper, no level of asbestos in talc is acceptable for cosmetic use. *Id.*

124. J&J was aware of studies demonstrating that both talc and asbestos have been found in the tissue of women who never worked with asbestos or talc. *See* 2/19/2019 Deposition of Susan Nicholson at 83:6-11.

125. J&J and the Defendants have known for many years that the talc used in Johnson's Baby Powder could be inhaled and reach deep into the lung.

126. For decades, J&J and the Defendants (and their predecessors) have known about the dangers of talc powder inhalation during the normal and expected use of its talc-based cosmetic PRODUCTS, especially to babies. *Id.* at 111:2-112:15; *see also id.* at 116:11-119:18; 5/27/2009 email from Nancy Musco.[4]

## E. DEFENDANTS' ACTIONS IN RESPONSE TO THE EVIDENCE OF CANCER RISK

127. In response to these inquires, J&J has always assured consumers that asbestos has never been found in Johnson's Baby Powder and that it never will. Historically, when pressed, J&J

---

[4] *See* 11/10/1971, Letter from A.M. Langer to G. Hildick-Smith; 8/24/1972, Memo from W. Nashed to R.A. Fuller; 9/25/1972, Memo from W. Nashed to Fuller, Hildick-Smith, on Shower-to-Shower/Asbestos FDA Meeting 9/21/1972; 6/12/1972, ES Laboratories Talc Analysis (Asbestos); 12/13/1973, Memo from M.J.M. Oerlemans to J.H. Smids, H.L. Farlow, Re: Asbestos in Baby Powder; 9/9/1975, Memo from G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting; 4/23/1998, Letter from A.M. Blount to R. Hatcher; Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc; University of Minnesota Investigation of Possible Asbestos Contaminations in Talc Samples.

39

always responded that there is no evidence that Johnson's Baby Powder contained any amount of asbestos and there never was.

128.    J&J repeatedly told consumers and the public that "Baby Powder does not contain asbestos and never will. We test every single lot to ensure it." 12/19/2018 Johnson & Johnson Ad.

129.    Johnson's Baby Powder product label says it was the "Purest Protection," and it was advertised as "the best you can buy" and "the purest." P3695-265.

130.    The intent of these representations to consumers has always been "to reassure them they could feel safe and comfortable using Johnson's Baby Powder because it does not contain asbestos" and to convey that in using Johnson's Baby Powder, there was "zero chance" of exposing their families to asbestos. 2/15/2019 Deposition of Nancy Musco at 39:7-42:8.

131.    The statements made to consumers by J&J, including that Johnson's Baby Powder does not contain asbestos and that there was "zero chance" consumers were exposing their families to asbestos, were false when they were made, and J&J knew they were false when they made those statements.

132.    As a direct result of J&J's false representations that Johnson's Baby Powder never contained asbestos, millions of people, including babies, were unwittingly and needlessly exposed to asbestos.

133.    J&J has never communicated to the public or federal government that it knew that its asbestos-containing talc-based cosmetic PRODUCTS would be aerosolized and inhaled during normal use.

134.    J&J has never placed warnings on its talc-based powder PRODUCTS about the potential hazards presented by the PRODUCT being aerosolized in normal application.

135.    J&J never placed warnings on its talc-based powder PRODUCTS about the risk of

asbestos exposure.

136. J&J purposely withheld from their spokespeople, whose job it was to communicate the "no evidence of asbestos" message, any reports indicating there was in fact evidence of asbestos in Johnson's Baby Powder.

137. In 1973, Cosmetic Toiletry and Fragrance Association ("CTFA"), now known as Personal Care Products Council ("PCPC"), the trade association utilized by the Defendants to protect their interests, created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, PCPC designated a group of its members to test talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy but rather TEM and electron diffraction. The same members, however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Defendants then owning or having unfettered access to same.

138. Going forward, the difference between what Defendants knew diverged from what they were representing to the FDA. Defendants and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the adopted and most economical analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc nor detect tremolite asbestos contamination levels

41

below 2-5%.

139.    Defendants and third parties collectively met with and corresponded with PCPC and also met with the FDA to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by Defendants and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of XRD. Defendants knew that the XRD detection limits were inadequate. Defendants also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Decedent was exposed.

140.    In support of their voluntary XRD methodology, which was finally published in 1977, PCPC produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder PRODUCTS did not contain asbestos. PCPC, Defendants and other talc PRODUCT producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens. Defendants made and published representations claiming that their testing method was adequate, that they were ensuring that talcum powder PRODUCTS were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their PRODUCTS, and thereby inform the public, including Decedent, that talc-containing PRODUCTS contained asbestos.

141.    The Defendants have represented to various news media outlets and the public at

large that their PRODUCTS are "asbestos-free" when, in fact, their PRODUCTS did test positive

for asbestos, and those that did not were merely the result of inadequate and imprecise testing

methods. "No asbestos detected" means something much different than "no asbestos," but due to

Defendants' repeated conflation of the terms, the public has been led to erroneously believe talc

PRODUCTS are safe.

142.    Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and

the talc industry continued to show that talc and talcum powder PRODUCTS contained asbestos

as well as other constituents such as fibrous talc, cadmium, cobalt, chromium, copper, iron,

manganese, and nickel. None of these positive tests were ever produced or made known to any

regulatory agency until late 2019, and only after knowledge of their existence became known in

civil litigation.

143.    Since at least 1979, Defendants have conducted a campaign to convince the public

that their PRODUCTS are regulated by the FDA, that their tests are conducted pursuant to FDA

regulations, and that talcum powder PRODUCTS are, therefore, safe. Nothing could be further

from the truth: the FDA has never been granted the regulatory authority by Congress to regulate

cosmetics, including talcum powders.

144.    Defendants, collectively by their agreement and conspiracy, controlled industry

standards regarding the testing, manufacture, sale, distribution and use of talcum powder

PRODUCTS, and Defendants controlled the level of knowledge and information available to the

public, including Decedent, regarding the hazards of exposure to carcinogens, including talc,

asbestos, and fibrous talc. Defendants knowingly and intentionally released, published, and

disseminated invalid, inaccurate, outdated, and misleading scientific data, literature containing

misinformation, and false statements regarding the health risks associated with the use of talc and

43

talcum powder PRODUCTS, including those to which Decedent was exposed.

145.    Defendants, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in the data and embarked upon a plan of deception intended to deprive the public at large, including Decedent, of alarming medical and scientific findings surrounding the safety of asbestos-containing talc and talcum powder PRODUCTS, many of which remained in their exclusive possession and under their exclusive control.

146.    Defendants conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior: (a) to withhold from users of their PRODUCTS —and from persons who Defendants knew and should have known would be exposed thereto—information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder PRODUCTS became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos, talc and other carcinogens therein; and (d) to falsely represent that talc and talcum powder PRODUCTS, including those of Defendants, were safe for use by consumers.

147.    McCrone Associates, the laboratory selected by several talc producers—including Defendants—to analyze their PRODUCTS, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

148.    The PCPC "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control

44

applications." The published J4-1 method did not rely on TEM, but on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." PCPC met with and corresponded with Defendants and third parties to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer PRODUCTS, followed by tests by TEM when XRD was positive or suspicious.

149.   This voluntary testing method was developed by PCPC and Defendants and was advocated to the FDA by PCPC and Defendants in lieu of regulations requiring labeling and warnings on talcum powder PRODUCTS, even though PCPC and Defendants knew that the J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "PCPC Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite.

150.   In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using PCPC's own J4-1 method. There is no evidence that the Defendants ever shared this remarkable failure with the FDA or the public.

151.   The FDA, and ultimately Decedent, directly and/or indirectly relied upon PCPC's false representations regarding the safety of cosmetic talc. In fact, an FDA letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding PCPC's and Defendants' misrepresentations and concealment was obvious seven years later. In a response to a July 11, 1986 Citizen Petition requesting an asbestos warning label on cosmetic talc, the FDA stated that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" PCPC's J4-1 method has continued for the past four decades

45

to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc.

152.    In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, three decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

153.    On or about September 17, 1997, J&J's own toxicology consultant, Dr. Alfred Wehner, informed the company about false public statements being made by it regarding talc safety. P-20 (JNJ000040596).

154.    In response to safety issues related to talc and talc-based body powders, the CTFA formed the Talc Interested Party Task Force (TIPTF). The TIPTF, which was originally formed in anticipation of litigation related safety issues, periodically convened, including in the 1970s and 1980s, to defend talc in response to safety concerns about talc. The TIPTF once again convened in and around 1992 to combat the United States National Toxicology Program's study. Defendant J&J was one of the primary actors and contributors to the TIPTF. P-14 (JNJ000011704); P-83 (LUZ011963); 02/18/2016 Deposition of Mark Pollak Exhibit No. 2 Spreadsheet: Talc IP – Revenue Received; Date Initiated: 08/17/92.

155.    The stated purpose of the TIPTF was to pool financial resources of these companies in an effort to collectively defend the use of talc and, specifically, talc-based body powders at all costs, in anticipation of future litigation, to ensure self-regulation, and to prevent local, state, or federal regulation of any type over this industry. J&J wielded considerable influence on TIPTF. TIPTF hired scientists to perform biased research regarding the safety of talc. Members of TIPTF, including J&J, edited reports of the scientists hired by this group before they were submitted to governmental agencies and/or released to the consuming public. Members of TIPTF knowingly

46

released false information about the safety of talc to the consuming public and used political and economic influence on local, state, and federal regulatory bodies regarding talc. These activities were conducted by these companies and organizations, including J&J, over the past four (4) decades in an effort to prevent regulation of talc and to create confusion to the consuming public about the true hazards of talc relative to cancer. *See* P-14 (JNJ000011704); P-13 (JNJTALC000249618); P-122 (JNJ000021035); P-66 (IMERYS-A_0006056); P-20 (JNJ000040596); (P-12 (IMERYS-A_0021921); P-27 (JNJ000000636); P-24 (JNJTALC000716846); JNJTALC000224218.

156.    At all times relevant, in anticipation of litigation and regulatory action, PCPC coordinated the defense of talc and talc-based body powder and acted as a mouthpiece for the members of the TIPTF, including J&J. PCPC, completely reliant on funding from cosmetic-industry companies, was motivated to defend talc and talc-based body powders to retain its members involved with these PRODUCTS and retain their revenues. Upon information and belief, and at all times relevant, PCPC's revenue has been predominantly generated through a dues system based in part on its members' annual sales. In addition, PCPC's salaries are nearly equivalent to the membership dues received, creating a direct pecuniary interest in defending the safety of talc, talc-based body powders and the PRODUCTS.

157.    In and around the mid-1970s, the Cosmetic Ingredient Review ("CIR") was formed to give PCPC and the cosmetic industry more credibility for self-regulation. Since that time, CIR has reviewed the safety of ingredients used in the cosmetic and personal care products industry. Although Defendants have, at all relevant times, promoted CIR as an independent, regulatory body, CIR is an organization within and wholly funded by PCPC. In fact, CIR shares the same office space with PCPC, and its employees are paid by PCPC.

47

158.    Over the years, CIR has reviewed thousands of ingredients used in the cosmetics industry but has only found 12 ingredients to be "unsafe for use in cosmetics." In contrast, CIR has deemed approximately 1,800 ingredients to be "safe as used." Additionally, the CIR Expert Panel annually holds two-day quarterly meetings to review substances. Over the course of these annual meetings, the panel is able to review about 500 ingredients per year. On average, only about 20 minutes are spent discussing the safety of each ingredient.

159.    Even though PCPC knew of the safety concerns surrounding talc and talc-based body powders for almost three decades, the CIR did not begin to review talc until after the first lawsuit alleging a link between talc use and ovarian cancer was filed. Upon information and belief, during the CIR review process, Defendants, including PCPC, influenced the CIR scientists writing and performing the review and, ultimately, edited the reviews in a biased manner. Not surprisingly, when CIR published its final report in 2015, it found talc to be safe as used in cosmetics.

160.    In addition, Defendants procured and disseminated false, misleading, and biased information regarding the safety of talc, talc-based body powders, and the PRODUCTS to the public and used influence over federal, state, and local governmental and regulatory bodies regarding talc and talc-based body powder. *See* P-20 (JNJ000040596); P-10 (JNJ000021093); P-26 (IMERYS-A_0013094).

161.    Defendants engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Decedent, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling talcum powder products which contained asbestos and fibrous talc, which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Decedent.

162.    Defendants have long employed and/or consulted with doctors, scientists,

geologists, mineralogists, and toxicologists, and they have maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos and asbestiform talc fibers in talc and talc deposits. Despite the wealth of knowledge, Defendants continued to mine, mill, process, supply, distribute, design, manufacture, and sell talcum powder PRODUCTS which Defendants knew or should have known were dangerous and posed substantial risks of harm to others, including Decedent.

## F. DEFENDANTS MISREPRESENTED OR CONCEALED INFORMATION ABOUT ASBESTOS IN THE PRODUCTS FROM THE GOVERNMENT AND THE PUBLIC

163.    Since the early 1970s, the FDA has repeatedly asked J&J whether it's talc-based PRODUCTS contained asbestos (2/19/2019 Deposition of Susan Nicholson at 87:10-23) including, whether there was any evidence of any amount of asbestos in any JJ&J's cosmetic talc PRODUCT. *Id.* at 88:20-24.

164.    J&J's answer to the FDA's inquiries was always the same: there is no evidence of any amount of asbestos in any J&J cosmetic talc PRODUCT. *Id.* at 89:3-8.

165.    While J&J's CEO has recently proclaimed that "we have always cooperated fully and openly with the FDA and other regulators and have given them full access to our talc testing results" the record is to the contrary. *See* 12/19/2018 Johnson & Johnson Ad; *see also* Alex Gorsky Video (JJ&J claims that it "has cooperated fully with the U.S. FDA and other global regulators providing them with all the information they requested over decades.").

166.    In the early 1970s, independent scientists publicly reported finding asbestos in J&J talc PRODUCTS. *See* 11/10/1971 Letter from A.M. Langer to G. Hildick-Smith; 9/9/1975 Memo from G. Lee Re: A.M. Langer Analysis of Talcum Powder Products – Edinburgh Meeting; Meeting with Dr. Langer on July 9 Concerning Analytical Analysis of Talc.

49

167.    In response, J&J sought to discredit the independent scientists' results and hired consultants to refute the asbestos in talc findings. Some of J&J's experts found asbestos when evaluating consumer talc PRODUCTS. These results were reported to J&J, though the company never provided those results to the FDA. J&J's claim that it provided the FDA with its "entire background file on asbestos talc testing" related to the company's cosmetic talc PRODUCTS was untrue because it never provided the FDA with the test results it received that identified asbestos in its talc and cosmetic talc PRODUCTS. *See* 2/19/2019 Deposition of Susan Nicholson.

168.    J&J did not tell the FDA that it possessed test results finding asbestos in the mine ore and the finished talc PRODUCT, nor did it give those results to the FDA. *See id.* at 105:2-5.

169.    Under cross-examination, J&J's representative was forced to admit that despite claiming that it provided all testing to the FDA, J&J never provided any results of asbestos testing of its talc PRODUCTS or ore to the FDA for the Vermont mine after 1973. 3/6/2019 Deposition of Susan Nicholson at 293:12-294:19. These include tests in which fibers matching the J&J definition of asbestos were found. *Id.* at 349:6-353:23.

170.    Since the early 1970s, J&J represented to the FDA that there was no tremolite or fibrous talc in its talc-based cosmetic PRODUCTS. 2/19/2019 Deposition of Susan Nicholson at 89:17–90:8; *see also* 7/21/1971 J&J Memo to File: Special Talc Project No. 503 FDA Meeting.

171.    Over the course of more than 4 decades, J&J represented to the FDA "over and over again" that there is not a single instance or report of asbestos – including chrysotile asbestos – in its PRODUCTS. 2/19/2019 Deposition of Susan Nicholson at 98:10-19.

172.    Beginning in early 1970s, J&J represented to the FDA that its data "conclusively proves that Johnson's Baby Powder is free of asbestos." *Id.* at 90:9-23; *see also* 9/21/1971 Letter from W. Nashed to FDA Director R. Schaffner ("It is seen that the data conclusively proves that

50

Johnson's Baby Powder is free of asbestos.").

173.    J&J has represented to the FDA that "no amphibole materials have been detected" in the company's talc-based PRODUCTS. 2/19/2019 Deposition of Susan Nicholson at 99:2-21; *see also* Exhibit 132 (3/15/1976 Letter from G. Lee re: Examination of Asbestos in Talc at 6).

174.    When pressed, J&J went so far as to represent to the FDA that "there wasn't a shred of evidence to support the idea that either our Johnson's Baby Powder or Shower to Shower contained any chrysotile asbestos." 12/13/1972 J&J Memo re: Meeting Nov. 1, 1972 with Dr. Schaffner – FDA); *see also* 2/19/2019 Deposition of Susan Nicholson at 90:24-91:18.

175.    J&J knew that its standby consultant McCrone purposely omitted findings of asbestos in its talc-based PRODUCTS because it "would only tend to confuse the issue perhaps with the FDA" and offered that if J&J "decide[d] to use these reports with the FDA" to "please call us." 10/12/1971 Letter from G. Grieger to A. Goudie; *see also* 3/6/2019 Deposition of Susan Nicholson at 327:14-328:21.

176.    As a part of its testing and reporting protocol for J&J's talc-based PRODUCTS, McCrone would segregate any test results that were positive for the presence of asbestos in talc ore or cosmetic talc PRODUCTS from those that allegedly found "no quantifiable" asbestos. For instance, on April 29, 1986, under McCrone Project No. ME-2275 and Purchase Order WS-0503, McCrone authored two separate reports of test results for Windsor Minerals. The first was for 11 talc samples in which "no quantifiable" amounts of asbestiform were found. The second was for the three talc samples (noticeably extracted from the numbering sequence) in which traces of chrysotile were found. *Compare* Deposition of Nancy Musco Ex. 8B, Tab 73 *with* 4/29/1986 Edley Samples.

177.    As further explained in the paragraphs below, McCrone and J&J worked together

to manipulate the asbestos testing results of J&J products done by outside laboratories and reported those manipulated findings to the FDA as negative results.

178.    Although aware of McCrone reports to the contrary, J&J represented to the FDA that its consultant McCrone Associates never found asbestos in the talc ore that was used to make the PRODUCTS. 3/6/2019 Deposition of Susan Nicholson at 316:8-23; *see also id.* at 326:20–327:2 (J&J cites McCrone tests to the FDA to support its position that there was "no evidence" of asbestos in the Shower to Shower product). This statement to the FDA was false.

179.    In 1972, after J&J was notified that an FDA consultant found asbestos in the J&J talc PRODUCTS, J&J hired Professor Hutchinson from the Minnesota Space Center to privately test the PRODUCTS with the intention of refuting the FDA consultant's findings.

180.    On September 20, 1972, in anticipation of a meeting with the FDA to discuss the asbestos test results, J&J executives arranged for its consultant, Ian Stewart of McCrone, to meet with Professor Hutchinson in the Chicago O'Hare airport. At that meeting, Professor Hutchinson informed Ian Stewart that he found "incontrovertible asbestos" in J&J's talc-based PRODUCTS (handwritten notes by Professor Hutchinson). From there Mr. Stewart, on behalf of J&J, flew directly to Washington DC to meet with the FDA to discuss test results. Mr. Stewart never disclosed Dr. Hutchinson's findings of asbestos to the FDA. *See* Ian Stewart Traveling Expense report.

181.    Thereafter, Professor Hutchinson provided J&J with a formal report documenting his asbestos findings with photographs of the asbestos he found in the J&J PRODUCTS. J&J produced excerpts of the report to the FDA, removing all references to Professor Hutchinson's "incontrovertible" findings of chrysotile asbestos. 3/6/2019 Deposition of Susan Nicholson at 339:20-341:9, 345:11-21.

52

182.    J&J similarly never informed the FDA that it was aware of additional evidence demonstrating the presence of actinolite in Johnson's Baby Powder. *Id.* at 325:4-15. For example, J&J did not submit a March 1974 test result from Professor Reynolds at Dartmouth College that "Actinolite is the dominant fiberform amphibole in the ore and talc product provided by Windsor Minerals." *Id.* at 346:24-347:2; *see also* JNJ 000266903 (3/1974 Memo re: Analysis of Talc Products and Ores for Asbestiform Amphiboles).

183.    Instead, J&J submitted test results to the FDA from Dartmouth claiming that no amphiboles were found in the company's talc PRODUCTS. *See* 2/19/2019 Deposition of Susan Nicholson at 158:10-159:1.

184.    As part of its plan to mislead the FDA and falsely claim its talc ore and cosmetic talc PRODUCTS were free of any asbestos, J&J hired outside consultants to conduct tests of J&J talc PRODUCTS using test methods that J&J knew would not detect asbestos at low levels. 2/19/2019 Deposition of Susan Nicholson at 196:19–24, 197:24-198:8.

185.    Thereafter, J&J submitted test reports to the FDA as proof that its talc was asbestos free knowing that the methods used would not detect asbestos at low levels and, thus, were not reliable to rule out the presence of asbestos. *See* 3/6/19 Deposition of Susan Nichols at 255:23-256:4.

186.    Instead of utilizing a method it knew was sensitive enough to find asbestos at low levels, J&J routinely used a testing method that was not sufficient to detect asbestos at those level and continued to submit the same false negative testing results to the FDA. This method was known as J4-1.

187.    The J4-1 testing method utilized "XRD" as the initial screen to determine if any further testing was necessary (with a level of detection of about 1%). Exhibit 139 (CTFA Method

53

J4-1 Part I & Part II). If the XRD test result was negative, no more testing would occur, and the sample would be reported as "none detected." This process virtually guaranteed that low levels of asbestos would never be found.

188.    J&J similarly knew that XRD could not detect chrysotile at levels below two or three percent of the talc PRODUCT and was also incapable of detecting low levels of tremolite. 2/19/2019 Deposition of Susan Nichols at 196:19-198:8.

189.    In the unlikely event an XRD test result was positive, J&J implemented a second step, polarized light microscopy ("PLM") but instructed the PLM analyst not to count all of the fibers he or she would actually see under the microscope. CTFA Method J4-1 Part I & Part II. Short fibers, below a defined size, recognized as carcinogenic, were excluded from any reporting. According to the J4-1 method, a fiber must have an aspect ratio (length to width) of 5:1 or greater, and both dispersion testing and fibrous morphology criteria must be satisfied before a particle can be identified as asbestiform. *See id.*; JNJNL61_000005032 (5/21/1995, Johnson & Johnson TM7024 TEM Analysis of Talc for Asbestiform Minerals).

190.    J&J knew and was advised of other methods of testing talc that were sensitive enough to detect the presence of small fibers of asbestos in its talc ore and/or cosmetic talc PRODUCTS and, thus, provide more accurate results than the testing it purposely utilized to increase the likelihood of negative results. One of those methods was the "pre-concentration" method. JNJ 000268037 (12/27/1973 Colorado School of Mines Research Institute report); JNJAZ55_000005081 (6/6/1973 Memo to Pooley from Rolle); JNJ000266903 (3/1974 Memo from R.C. Reynolds, Jr. to Windsor Minerals, Inc.) ("a concentration technique is mandatory because it brings the amphiboles into a reasonable concentration range for optical or other methods of analysis."); JNJNL61_000007330 (Special Talc Studies Monthly Report, March, 1974 – Assay

54

Methods for Asbestos Minerals in Talc); JNJ 000250919 (3/11/1974 Memo from J.P. Schelz to F.R. Rolle); Exhibit 144, JNJNL61_000062964 (11/26/1974 Memo from J.P. Schelz to F.R. Rolle) (collectively referred to as "concentration method").

191.    Internal J&J memoranda prove the company considered "the limitation" of the concentration method "is that it may be too sensitive" and when used found traces of tremolite which the J&J testing methods would fail to expose. JNJAZ55_00001892 (5/16/1973 Memo from F.R. Rolle to T.H. Shelley).

192.    When J&J consultant, Dr. Fred Pooley, told J&J that the concentration method was being used in Great Britain, the method was rejected by J&J as not "in the worldwide company interest." JNJNL61_000062953 (2/18/1975 Johnson & Johnson Limited letter to Johnson & Johnson).

193.    Although many of J&J's consultants—including the Colorado Research School of Mines, Professor Pooley of Cardiff University, Professor Reynolds of Dartmouth College, and Professor Alice Blount of Rutgers University—found asbestos in J&J's talc-based cosmetic PRODUCTS using the pre-concentration method, the company did not provide any of those test results to the FDA. 2/19/2019 Deposition of Susan Nicholson at 172:8-15.

194.    J&J was also urged by its consultants to use TEM to test for asbestos as it was far more sensitive than the J4-1 method used by J&J. *See, e.g.,* JNJNL61_000006726 (5/18/1973 Message on from G.E. Heinze to W. Ashton et al. – Talc Symposium); JNJ 000035507 (9/30/1992 Notes on Meeting with Professor F. Pooley, Cardiff) ("TEM is the only suitable method for looking for fibers of biologically relevant dimensions in lungs, therefore it is logical to use the same technique for examining mineral products for biologically relevant fibers."); Johnson & Johnson correspondence at FDA_FOIA_013573 ("I think we all recognize XRD, PCM, and PLM are

simply not sensitive enough to provide complete assurance that the talc is free of detectable asbestos.").

195.     Eventually, J&J began to use TEM as a testing method on a limited basis but implemented a TEM reporting methodology designed to yield negative, rather than accurate results. In this regard, J&J intentionally limited the amount of each sample that was analyzed and required a high fiber count of the same mineral type before a positive result could be reported. J&J called its method TM7024.

196.     According to J&J's TM7024 method, J&J would report the test results as negative and "not quantifiable" unless the scientist, who was directed to look only at approximately 10 percent of the material available to examine under the microscope, counted 5 or more asbestos fibers of the same variety. JNJNL_000005032 (5/21/1995, Johnson & Johnson TM7024 TEM Analysis of Talc for Asbestiform Minerals). Thus, even if the examiner counted as many as 16 asbestos fibers (i.e., four fibers each of tremolite, actinolite, anthophyllite, and chrysotile) looking only at 10 % of the sample seen under the microscope, it would be reported as not finding asbestos or "not quantifiable."

197.     J&J's position about the scientific propriety of its TM7024 testing protocol was and remains inconsistent with that of environmental and health agencies. The United States Environmental Protection Agency ("EPA") has refused to limit its concern to only the type of identifiable asbestos fibers J&J instructs its microscopists to count. 4/20/2006 US EPA Region IX Response to the November 2005 R.J. Lee Group, Inc.

198.     To further reduce the likelihood of detecting asbestos in its cosmetic talc ore, J&J required J4-1 method testing on only a composite from every two silos of talc (each silo containing hundreds of tons of talc), TM7024 testing only quarterly from a composite of all siloed talc, and a

56

monthly composite of float feed. JNJMX68_000002913 (10/4/1984 Memo from J.A. Molnar to B. Semple, on Evaluation Program for Talc). As a result, the total amount of talcum powder J&J ever put under a microscope to test for asbestos was approximately 1/100 of a breath mint by weight. 1/29/2020 Testimony of Matthew Sanchez 134:19-135:20.

199.    Even though J&J tested miniscule amounts of product and utilized methods specifically designed to yield negative results, asbestos was still found in J&J's's cosmetic talc. *See* chart of various testing results. Upon information and belief, J&J did not produce these asbestos-positive test results to the public until 2017.

200.    In 1976, J&J rejected the FDA's request to provide the results of its respective periodic monitoring for asbestos. *See* 3/6/19 Deposition of Susan Nicholson at 255:17-256:6.

201.    J&J also submitted false and misleading statements through its trade association (CTFA).

202.    In March of 1976, the CTFA told the FDA that all industry testing had shown all talcum powder PRODUCTS to be completely free of asbestos. *See* JNJ000330157.

203.    On March 15, 1976, George Lee, Director of Applied Research for Johnson & Johnson, wrote to the CTFA, with the "understanding that you would wish to submit this information to the FDA," that it was "erroneously reported in 1971 that our powder contained asbestos," that the Vermont talc is "highly purified," and that J&J confirms the "absence of asbestos materials in this talc." WCD000009. This false information was then transmitted by the CTFA to the FDA to "give assurance as to the freedom from contamination by asbestos form materials of cosmetic talc products." JNJ000330157.

204.    Two weeks later, on March 31, 1976, J&J met privately in Hillside, New Jersey. During this meeting, Defendants congratulated themselves on the "success" of the "presentations"

57

to the FDA and agreed that they should not bind themselves to having to further update the FDA. JNJ000299024.

205.    On March 1, 1978, John Schelz, the Chairman of the CTFA Task Force on Round Robin Testing and then current employee of J&J, instructed the CTFA to "destroy your copy of the table" containing the results of the CTFA Task Force on Round Robin Testing of Consumer Talcum Products for Asbestiform Amphibole Minerals. JNJNL_000062534 (3/1/1978 correspondence from Johnson & Johnson to the CTFA).

206.    Decades after asbestos was first reported, J&J continued to represent to the FDA that it had confirmed "the absence of asbestiform minerals" in its finished talc-based PRODUCTS. JNJ 000021285 (6/27/1995 Comments of CTFA in Response to a Citizens Petition at 7-8).

207.    As recent as 2016, J&J represented to the FDA that no asbestos structures have ever been found in its talc-based PRODUCTS in any testing anywhere in the world. 2/19/2019 Deposition of Susan Nicholson at 99:18-100:9; *see also* JNJ 000489313 (3/17/2016 J&J Response to FDA Request for Information on Talc at 12). This statement made to the FDA was false.

208.    In about 2013, while editing information for its website, J&J even acknowledged internally that it "cannot say our talc-based consumer products have always been asbestos free" but made the representations anyhow. Draft 1–Copy for Safety and Care Commitment Website.

## G. JOHNSON & JOHNSON DESTROYED OR SECRETED AWAY RELEVANT EVIDENCE

209.    J&J has had the duty to preserve evidence and documents relevant to foreseeable litigation, including the responsibility to suspend any document destruction policies beginning 1969, and certainly no later than 1971.

210.    Since at least 1969, J&J was aware that it was foreseeable and likely that it would be sued in personal injury litigation alleging pulmonary injuries–including asbestos-related

58

disease–attributable to J&J's talc-based PRODUCTS.

211.    On April 15, 1969, Dr. T.M. Thompson, Medical Director for J&J, wrote to Mr. William H. Ashton, a J&J executive supervising the company's talc-based PRODUCTS, to advise him of danger relative to "inhalation" of the "spicule" or "needle-like" crystals of tremolite in J&J's talc. *See* JNJ000087991 (4/15/1969 Letter from T. Thompson to W. Ashton Re: Alternate Domestic Talc Sources) ("[S]ince pulmonary diseases, including inflammatory, fibroplastic and neoplastic types, appear to be on the increase, it would seem prudent to limit any possible content of tremolite in our powder formulations to an absolute minimum.").

212.    Although Dr. Thompson states that he was not aware of "any litigation involving either skin or lung penetration by our talc formulations," he cautioned Mr. Ashton that "since the usage of these products is so widespread, and the existence of pulmonary disease is increasing, it is not inconceivable that [Johnson & Johnson] could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to inhalation of our powder formulations." *Id.* To that end, Dr. Thompson recommended that "someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise." *Id.*; *see also* 2/15/2019 Deposition of Nancy Musco at 64:18–68:1.

213.    Dr. Thompson further forewarned Mr. Ashton that the company could confront a situation where the company would be more or less compelled to remove its talc PRODUCTS "if it became known that our talc formulations contained any significant amount of Tremolite." JNJ000087991 (4/15/1969 Letter from T. Thompson to W. Ashton Re: Alternate Domestic Talc Sources).

214.    Dr. Thompson's prediction of litigation came to fruition shortly thereafter. By the

early 1970s, J&J was involved in litigating and planning its defense to personal injury cases related to its talc PRODUCTS.

215.    Through the litigation process, JJ&J has been forced to identify documents from as early as 1971 (and from every year thereafter) relating to "ongoing," "pending," and "anticipated" litigation regarding Johnson's Baby Powder. 2/15/2019 Deposition of Nancy Musco at 74:23-76:7, 93:3-16.

216.    Since at least 1971, J&J has known and recognized that information and documentation in the company's possession relevant to or produced in any particular talc-based lawsuit would be relevant to discovery in future talc-based cases. *See id.* at 25:13-20.

217.    J&J has reported that during the 1970s alone, the company was sued in talc-based cases in nearly every year of the decade. *See id.* at 81:25-82:12. Although J&J was legally obligated to retain the evidence, it does not know where the documents and evidence related to these cases are located or whether they even exist. *See id.* at 78:25-79:23, 80:6-81:24.

218.    While the evidence from the cases is missing, documents listed on J&J's privilege log related to these cases date back to 1971 and every year thereafter. *See id*. at 93:3-16. The cases described on the log indicate the records from which were spoliated and no longer exist include litigation involving both industrial talc and Johnson's Baby Powder. *See id.* at 93:17-94:16.

219.    The destruction or secreting away of evidence began at least as early as the 1970s. In 1977, for example, the Talc Task Force conducted "round robin" testing of talcum powder products manufactured by member companies.

220.    John P. Schelz, a J&J employee and chair of the Talc Task Force, coordinated the testing and review of the testing data. *See* JNJ 000250596.

221.    Once the testing data was received, Schelz compiled the data in a table and assigned

each sample a coded value. He then created a separate "code key" to interpret the coded value assigned to each sample.

222.    He did not send the code key to any of the other companies. *See* JNJ 000265120.

223.    Schelz sent the only other copy of the code key to Charles Haynes at PCPC with instructions to destroy the code key after Haynes called the companies to inform them of the results. *See id.*

224.    Upon information and belief, both Schelz and Haynes destroyed the code keys to the "round robin" testing results. As a result, it's impossible to determine which products were tested. *See id.*

225.    All companies involved in the "round robin" testing agreed to the process of destroying the code key.

226.    The information contained in files of cases involving injuries sustained from J&J's industrial talc is highly relevant to this case as it was the same used in JBP. *See* Affidavit of Roger Miller, *Edley v. Windsor Minerals, Inc.*, No. MID-L-075913-86 (N.J. Super. Ct. Middlesex County).

227.    According to J&J's own records prior to 2000, there were personal injury cases involving Johnson's Baby Powder filed and pending with future cases anticipated.

228.    Although J&J, by its own admission, had an obligation to preserve evidence once litigation concerning the health effects of its talc PRODUCTS was foreseeable, it failed to do so. *See* Deposition of Nancy Musco at 278:24-280:23.

229.    J&J knew and understood that evidence adduced in litigation concerning the health effects of its talc PRODUCTS would be material and relevant to other anticipated cases. *See id.* Yet J&J failed to preserve records from any of the lawsuits that alleged injuries as a result of

Johnson's Baby Powder, talc, or asbestos, even though J&J knew that relevant and material documents existed and were in its possession.

230.    While J&J internally recognized there could be dire consequences for failing to preserve evidence, there is no record of a litigation hold ever being imposed prior to 1997. Even then, JJ&J's General Counsel John O'Shaughnessy only preserved evidence when there was a case actually pending and not when anticipated. 6/29/2021 Deposition of John O'Shaughnessy at 310:20-311:5.

231.    J&J did not retain any samples of its talc ore or milled talc used in its talc-based cosmetic PRODUCTS, which it tested regularly, albeit insufficiently, for the presence of asbestos and asbestiform minerals at any time until 2017. *See* 10/18/2018 Deposition of James Mittenthal at 405:22-407:9, 424:2-425:7.

232.    The entries on the J&J privilege log indicate that samples of talcum powder used in litigation existed at the time the litigation in the 1970s, 1980s, and 1990s was pending, but those samples were destroyed. *See id.* at 93:17-94:16. The relevance of those samples was acknowledged by J&J internally on numerous occasions.

233.    Although litigation was pending and anticipated, the samples chosen by J&J specifically to create test results were not retained under the company's evidence retention schedules and were not subject to any litigation-hold. *See id.* at 371:14-374:9, 384:8:387:4, 405:22-407:9.

234.    J&J's failure to institute a litigation hold also made certain that the testing results were destroyed in accordance with its document retention policy. *See id.* at 405:22-407:1.

235.    At all times relevant to this current lawsuit, J&J has been in complete control of all aspects of the domestic and foreign subsidiaries implicated in its talc, including, but not limited to,

the testing of talc source ore mines and testing of finished Johnson's Baby Powder end-products. J&J knew, or should have known, that this material would be material in pending and anticipated cases alleging injury resulting from exposure to its talc PRODUCTS and, therefore, had a duty to preserve that testing evidence. J&J destroyed those testing results and discarded its samples of talc.

236.    J&J failed to preserve talc samples maintained in its museum after 1982 when the museum was suspended, even though litigation was pending and anticipated at that time. *See* 7/12/2018 Deposition of Margaret Gurowitz at 157:24-159:17.

237.    J&J did not instruct its consultants that repeatedly tested its talc ore and PRODUCTS to retain the samples tested, even though litigation was pending and anticipated. *See, e.g.*, 7/12/2018 Deposition of Margaret Gurowitz at 158:12-159:16. Although J&J was acutely aware that it was McCrone's policy to dispose of samples 30 days after testing results were generated, it never instructed McCrone to retain any samples, including the samples specifically tested for purposes of litigation. *See, e.*g., 1/28/1987 McCrone Letter at JNJTALC000387715.

238.    J&J failed to retain all test results for the presence of asbestos and asbestiform minerals of the talc ore and milled talc used in its talc-based cosmetic PRODUCTS. *See* 10/18/18 Deposition of James Mittenthal at 405:22-406:24.

239.    Even after a litigation hold was finally issued, J&J failed to retain samples from its Worldwide Talc Survey. *See* JNJNL_000015761 (10/20/2000 Letter).

240.    From the 1950s to the 2000s, Defendant J&J (or outside laboratories, including RJ Lee, and McCrone) tested samples of talc for asbestos content.

241.    Upon information and belief, Defendant J&J failed to ensure the preservation of these samples, TEM grids, count sheets, photomicrographs, and other documents generated during the testing and, as a result, the samples, TEM grids, count sheets, photomicrographs, and other

63

documents generated during the testing were destroyed.

242.    Any test results that J&J has not yet produced are presumed to be destroyed, as the disposal of these results were mandated by the company's evidence retention scheduled absent a litigation hold, which J&J never issued. *See id.*

243.    In addition to final testing results, J&J failed to preserve any of the original scientific data underlying these results. Besides failing to retain the actual talc ore and milled talc samples, Johnson & Johnson did not retain photomicrographs, count sheets, or TEM grids and knowingly allowed for this evidence to be destroyed.

244.    This missing scientific data is of utmost importance to the fair and proper vetting of J&J's defense. The limited underlying scientific data that still exists confirms that the reports of "no detectable" asbestos are belied by the underlying scientific data, which shows evidence of asbestos. *Compare* page 1 *with* pages 4 and 10 in 11/26/1990 McCrone letter to Michael J. Keener Re: sample analysis. There are countless similar non-detect letters with no underlying data.

245.    Plaintiff is clearly hampered in the ability to prove his case by the intentional destruction of the samples and underlying testing data as evidenced by the fact that the underlying data that mistakenly avoided the shredder proves that the tests, which J&J asserts were negative, found that J&J talc was contaminated with asbestos. *See id.* at163.

246.    The destruction of the underlying testing data is not limited to McCrone but extends to all outside consultants hired by J&J. For example, while the University of Minnesota found asbestos in J&J talc while litigation was pending against J&J, the photomicrographs underlying the reported findings of asbestos minerals are missing. *See* 3/6/2019 Deposition of Susan Nicholson at 333:8-23.

247.    In 1989, after facing litigation related to its talc-based products for nearly two

decades and anticipating further litigation, J&J intentionally destroyed records relating to its Hammondsville, Vermont mining operations. *See* JNJ 000240739 (11/23/1993 Denton to Ashton and Jones at p. 3).

248.    J&J has represented that "[i]f we had any reason to believe our talc was unsafe, it would be off our shelves immediately." 12/19/2018 Johnson & Johnson Ad.

249.    Yet in the Joly case, J&J's Medical Services Department – including the company's Medical Director–recognized that the plaintiff, who had used Johnson's Baby Powder for years, had "scarring of lung tissue [that] was noted on x-ray." Furthermore, "Pulmonary function studies revealed very severe obstruction of the small airways. Consumer did not respond to bronchodilators. Talc crystals were identified in the consumer's sputum." *See* 2/15/2019 Deposition of Nancy Musco at 155:18-158:25; *see also* JNJ 000058414 (5/10/1985 J&J Ingestions and Inhalations Memorandum).

250.    Besides this report, J&J has not located its records related to the Joly litigation even though Mr. George Lee, a Johnson & Johnson scientist, had a file on the case in his possession as late as July 1988. *See id*. at 170:16-172:20. Yet, J&J's designated corporate representative concerning the history and substance of prior litigation was not supplied with a single piece of paper regarding the Joly case. *See id.* at 159:21-161:11.

251.    Evidence indicates that J&J historically preserved no records whatsoever from the majority of cases in which it has been sued for causing talc related injuries.

252.    For those cases where there is at least some documentation, J&J either lost or destroyed most of the material evidence related to historical litigation alleging asbestos-related disease from its talc-based PRODUCTS. *See e.g.*, 3/8/2019 Deposition of Nancy Musco at 361:24-362:17 (missing Westfall photographs); 2/15/2019 Deposition of Nancy Musco at 232:9-17

(missing Edley interrogatories); *id.* at 111:23-112:3 (no records from the Cunningham case); *id.* at 112:10-25 (no records from the Kreppel case); *id.* at 113:12-114:3 (no records from the Lopez case); *id.* at 114:19-22 (no records from the Sheldon case).

253.    Despite being involved in countless cases dating back to 1971, J&J could only locate two sets of discovery responses for its corporate representative to review. *See id.* at 202:2-13.

254.    In this litigation, J&J has repeatedly asserted the relevance of its communications with the FDA concerning the safety of talc. J&J once maintained a paper file documenting all of its telephone conversations with the FDA related to its talc-based cosmetic PRODUCTS dating to the early 1970s. *See* 2/19/2019 Deposition of Susan Nicholson at 48:9-15. The "FDA Call File" was destroyed while litigation was pending depriving all future litigants, including the Plaintiffs herein, of the evidence concerning J&J's extensive discussions with the FDA. *See id.* at 113:25-114:19.

255.    J&J once maintained toxicology information in boxes and binders. This toxicology information contained in those files was never disclosed and is apparently missing.

256.    William Ashton, otherwise known within J&J as "Mr. Talc," was intimately involved in issues affecting the safety of talc for the entire length of his career at J&J spanning many decades. As part of his responsibility, Ashton maintained his own set of files concerning J&J talc. Those files concerning talc and asbestos maintained by William Ashton, while litigation was pending remain unaccounted for. *See* Note from Rebecca Farlow to William Ashton with a "list of TALC files from the last case."

257.    According to J&J, McCrone was the primary outside consultant charged with testing J&J talc for asbestos. The original McCrone testing files were sent to in house counsel

66

while litigation was pending. Instead of producing those files to litigants alleging talc related injuries, the files were secreted away in the offices of outside counsel. *See* Letter Dated 1/3/1995; 6/29/2021 Deposition of John O'Shaughnessy at 24:10-25:1, 155:12-156:3, 251:14-252:13. When some McCrone testing results were finally produced after 2016, the complete McCrone files secreted away in the offices of outside counsel were not produced. Virtually all of the underlying scientific data was either lost or destroyed.

258.    Defendant J&J intentionally failed to preserve relevant documents generated in litigation in a number of cases filed against it between the 1960s to the 1990s.

259.    J&J not only destroyed and covered up evidence—it hid the evidence from Courts and litigants for more than 40 years. In the process, evidence was lost and/ or destroyed. *See* 3/8/2019 Deposition of Nancy Musco; 6/30/21 Deposition of John O'Shaughnessy; 6/12/91 Deposition of Roger Miller; 4/26/1983 Deposition of Peter Gale; 3/16/1983 Deposition of Glenn Hemstock in Westfall; 10/19/18 Deposition of James Mittenthal; 7/23/2019 Barden Hopkins Trial Tr.; Affidavit of Roger Miller, *Miller v. A.C. & S, Inc.*, No. ACV884-1087 (Summit Cnty. Ct. Comm. Pls.); 7/7/2016 Affidavit of John Hopkins.

## COUNT I: NEGLIGENCE
(as to Publix Super Markets, Inc., only)

Plaintiff adopts, re-alleges and incorporates the allegations in paragraphs 1 through 259 above, and further alleges the following:

260.    At all material times, Defendant sold asbestos-containing talcum powders including, but not limited to, the PRODUCTS.

261.    Starting in approximately in the 1970s, Decedent, and/or her family members, purchased the PRODUCTS from Defendant.

262.    At all material times, Defendant knew, or in the exercise of reasonable care should

67

have known, that Decedent or others similarly situated would purchase, use, and be exposed to asbestos from talcum powders.

263.    While using, consuming, and applying the PRODUCTS sold by Defendant, Decedent inhaled and was otherwise exposed to talc and asbestos fibers contained within and emitted from such products, causing Decedent to eventually develop ovarian cancer.   Each exposure to such products was harmful and substantially contributed to causing Decedent's ovarian cancer.

264.    At all material times, Defendant monitored various regulatory agencies, including, but not limited to, the United States Food and Drug Administration (FDA), United States Department of Agriculture Food Safety Inspection Service (USDA FSIS), United States Consumer Product Safety Commission (CPSC), and United States Environmental Protection Agency (EPA), for the purpose of ensuring customer safety.

265.    For corporations involved in the business of generating profits from the sale, supply, and distribution of talcum powder products, such as Defendant, accessible information existed since at least 1970 regarding asbestos contamination in talc and in talcum powder products, for example:

    a.   On December 15, 1970, the Washington Post reported that talc used in the inner walls of rubber balloons may be contaminated with asbestos.

    b.   On June 29, 1971, the New York Post reported that common talcum powder may contain harmful quantities of asbestos.

    c.   On July 18, 1971, the New York Times reported that New York City's Environmental Protection Agency had detected asbestos in "baby talcum powder."

d.  In July 1972, the National Institute for Occupational Safety ("NIOSH") issued a report titled *Fiber Exposure During Use of Baby Powders*, finding that seven of nine samples tested (including Johnson's Baby Powder) contained asbestos.

e.  On June 16, 1972, the New York Times reported that New York City's Environmental Protection Agency found asbestos fibers in Johnson's Baby Powder.

f.  In 1973 the Food and Drug Administration ("FDA") proposed a regulation on the permissible asbestos content of talc.

g.  In 1976, an article was published in the Journal of Toxicology and Environmental Health noting that consumer talc products marketed before 1973 were variably contaminated by asbestos.

h.  In October 1976, the Cosmetic, Toiletry and Fragrance Association revised their guidelines for talc and recommended that no sample containing asbestos detectable by X-ray diffraction and optical microscopy be sold.

i.  In February 1980, NIOSH issued a technical report titled "*Occupational Exposure to Talc Containing Asbestos*," concluding that exposures to talc are associated with an increased risk of pleural thickening, pleural calcification, and cancer.

266.    At all material times, Defendant knew or should have known that talc, talcum powders, and the PRODUCTS were contaminated with asbestos.

267.    At all material times, Defendant knew or should have known that exposure to asbestos can cause serious injuries including, but not limited to, ovarian cancer.

268.    At all material times, Defendant knew or should have known that Decedent's use of the PRODUCTS was harmful and could cause serious injuries including, but not limited to, ovarian cancer.

69

269.     At all material times, Defendant knew or should have known, that the PRODUCTS would be used by and around Decedent, or those similarly situated, without inspection for defects and furthermore, that Decedent's inspection of such products would not have revealed the asbestos fibers or underlying danger contained in such products; or that exposure to the same could cause severe injury and death.  These facts, known to or readily ascertainable by Defendant, made such products inherently and unreasonably dangerous.

270.     At all material times, Defendant owed a duty to Decedent to (a) adequately warn Decedent of the dangerous characteristics of talc, talcum powders, and the PRODUCTS; (b) adequately warn Decedent that she could develop fatal injuries including, but not limited to, ovarian cancer, as a result of being exposed to talc, talcum powders, and the PRODUCTS; and (c) place adequate warnings on or in the containers of the PRODUCTS warning of the dangers to one's health of coming in contact with talc and asbestos and of the gravity of the risk and extent of danger that Decedent was exposing herself to by using such products.

271.     At all material times, Defendant was negligent, failed to exercise reasonable care and breached its duties to Decedent by failing to adequately warn Decedent of the dangerous characteristics of talc, talcum powders, and the PRODUCTS; (b) adequately warn Decedent that she could develop fatal injuries including, but not limited to, ovarian cancer, as a result of being exposed to talc, talcum powders, and the PRODUCTS; and (c) place adequate warnings on or in the containers of the PRODUCTS warning of the dangers to one's health of coming in contact with talc and asbestos and of the gravity of the risk and extent of danger that Decedent was exposing herself to by using such products.

272.     As a result of Defendant's negligence and failure to exercise reasonable care, Decedent sustained exposure to asbestos from the PRODUCTS, causing Decedent to develop

70

ovarian cancer.

273.    Defendants' negligence and failure to exercise reasonable care was a proximate cause of the harm to Decedent.

274.    Due to her ovarian cancer, Decedent required medical treatment; was greatly inconvenienced in her ability to lead and enjoy a normal life; was permanently impaired; was unable to work; and passed away from her ovarian cancer.  As a result of her condition, Decedent suffered extreme pain, mental anguish, depression, and other physical and mental disorders; incurred medical expenses for treatment of physical and mental injuries; and was physically and permanently handicapped.  Said injuries are permanent and continuing in nature, causing Decedent to horribly suffer up until her death.

275.    The aforementioned injuries, disabilities and death of Decedent are the direct and proximate cause of the negligence of Defendant because Defendant sold products which Defendant knew or, in the exercise of ordinary and reasonable care, should have known were deleterious and highly harmful to Decedent's health and well-being, and yet did nothing to advise Decedent of this information.

**WHEREFORE**, Plaintiff prays for judgment against Defendant on this count for compensatory damages against Defendant, for his costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiff may show himself to be justly entitled.

### COUNT II: NEGLIGENCE
(as to all Defendants *except* Publix Super Markets, Inc.)

Plaintiff adopts, re-alleges and incorporates the allegations in paragraphs 1 through 259 above, and further alleges the following:

276.    At all material times, Defendants, and/or their merged, consolidated, or acquired

71

predecessors, divisions, subsidiaries, and/or alter-egos, mined, milled, or manufactured the PRODUCTS.

277.   At all material times, Defendants, and/or their merged, consolidated, or acquired predecessors, divisions, subsidiaries, and/or alter-egos, sold, supplied, distributed, and/or manufactured the PRODUCTS.

278.   Decedent, or her family members, regularly purchased the PRODUCTS. During this time, Decedent regularly used, consumed and/or applied the PRODUCTS.

279.   At all material times, Defendants knew, or in the exercise of reasonable care should have known, that Decedent or others similarly situated would purchase, use and be exposed to talc and asbestos from the PRODUCTS.

280.   While using, consuming, and applying the PRODUCTS, Decedent was exposed to talc and asbestos from the PRODUCTS, causing Decedent to develop ovarian cancer. Each exposure was harmful and substantially contributed to causing Decedent's ovarian cancer.

281.   At all material times, Defendants knew or should have known that the PRODUCTS contained asbestos.

282.   At all material times, Defendants knew or should have known that exposure to talc and asbestos can cause serious injuries including, but not limited to, ovarian cancer.

283.   At all material times, Defendants knew or should have known that Decedent's use of the PRODUCTS was harmful and could cause serious injuries including, but not limited to, ovarian cancer.

284.   At all material times, Defendants knew or should have known, that the PRODUCTS would be used by and around Decedent, or those similarly situated, without inspection for defects and furthermore, that Decedent's inspection of such products would not have revealed the asbestos

fibers or underlying danger contained in such products; or that exposure to the same could cause severe injury and death. These facts, known to or readily ascertainable by Defendants, made such products inherently and unreasonably dangerous.

285. At all material times, Defendants owed a duty to Decedent to (a) adequately warn Decedent of the dangerous characteristics of Defendants' asbestos-containing talc, talcum powders, and the PRODUCTS; (b) adequately warn Decedent that she could develop fatal injuries including, but not limited to, ovarian cancer, as a result of being exposed to talc, talcum powder, and the PRODUCTS; (c) place adequate warnings on or in the containers of the PRODUCTS warning of the dangers to one's health of coming in contact with talc and asbestos and of the gravity of the risk and extent of danger that Decedent was exposing herself to by using such products; and (d) manufacture, sell, and/or distribute the PRODUCTS according to Defendants' specifications requiring that such products be asbestos free.

286. At all material times, Defendants were negligent, failed to exercise reasonable care and breached their duties to Decedent by failing to (a) adequately warn Decedent of the dangerous characteristics of Defendants' asbestos-containing talc, talcum powders, and the PRODUCTS; (b) adequately warn Decedent that she could develop fatal injuries including, but not limited to, ovarian cancer, as a result of being exposed to talc, talcum powder, and the PRODUCTS; (c) place adequate warnings on or in the containers of the PRODUCTS warning of the dangers to one's health of coming in contact with talc and asbestos and of the gravity of the risk and extent of danger that Decedent was exposing herself to by using such products; and (d) manufacture, sell, and/or distribute the PRODUCTS according to Defendants' specifications requiring that such products be asbestos free.

287. As a result of Defendants' negligence and failure to exercise reasonable care,

Decedent sustained extensive exposure to talc and asbestos from the PRODUCTS, causing Decedent to develop ovarian cancer.

288.    Defendants' negligence and failure to exercise reasonable care was a proximate cause of the harm to Decedent and Decedent's death.

289.    Due to her ovarian cancer, Decedent required medical treatment; was greatly inconvenienced in her ability to lead and enjoy a normal life; was permanently impaired; was unable to work; and passed away from her ovarian cancer.  As a result of her condition, Decedent suffered extreme pain, mental anguish, depression, and other physical and mental disorders; incurred medical expenses for treatment of physical and mental injuries; and was physically and permanently handicapped.  Said injuries are permanent and continuing in nature, causing Decedent to horribly suffer up until her death.

290.    The aforementioned injuries, disabilities and death of Decedent are the direct and proximate cause of the negligence of Defendants because Defendants sold products which Defendants knew or, in the exercise of ordinary and reasonable care, should have known were deleterious and highly harmful to Decedent's health and well-being, and yet did nothing to advise Decedent of this information.

**WHEREFORE**, Plaintiff prays for judgment against Defendants on this count for compensatory damages against Defendants, for her costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiff may show herself to be justly entitled.

## COUNT III: STRICT LIABILITY
(as to all Defendants *except* Publix Super Markets, Inc.)

Plaintiff adopts, re-alleges and incorporates the allegations in paragraphs 1 through 259 above, and further alleges the following:

74

291.    Defendants, and/or their merged, consolidated, or acquired predecessors, divisions, subsidiaries, and/or alter-egos, are or have been a manufacturer, distributor, supplier, retailer, wholesaler or assembler of the PRODUCTS.

292.    The PRODUCTS were designed, manufactured, distributed, supplied, and/or sold by each of the Defendants, and/or their merged, consolidated, or acquired predecessors, divisions, subsidiaries, and/or alter-egos, and used by or in the vicinity of Decedent during her lifetime.

293.    Defendants, and/or their merged, consolidated, or acquired predecessors, divisions, subsidiaries, and/or alter-egos, mined, milled, manufactured, distributed, supplied, sold and/or otherwise placed into the stream of commerce or caused to be placed into the stream of commerce the PRODUCTS.

294.    Decedent used, was around, and was exposed to the PRODUCTS during her lifetime, during which time talc and asbestos from the PRODUCTS was introduced into Decedent's body eventually causing Decedent's ovarian cancer and death.

295.    At the time Defendants, and/or their merged, consolidated, or acquired predecessors, divisions, subsidiaries, and/or alter-egos, designed, manufactured, distributed, supplied, and/or sold the PRODUCTS, such products were expected to, and did, reach Decedent in a condition without substantial change from that in which such products were when within the possession of Defendants.

296.    The PRODUCTS to which Decedent was exposed were used in the manner in which they were intended.

297.    The PRODUCTS were dangerous beyond the expectation of the ordinary user when used as intended or in a manner reasonably foreseeable by Defendants.

298.    When used, the PRODUCTS failed to perform as safely as Decedent expected in

75

that the PRODUCTS caused Decedent to develop ovarian cancer and die from the same.

299.    The PRODUCTS were in a condition unreasonably dangerous to users, such as Decedent, and said products were expected to, and did, reach Decedent without substantial change affecting that condition.

300.    The PRODUCTS, which called for the use of talc that was contaminated with asbestos, were unreasonably dangerous because of their design in that the risk of danger to users, such as Decedent, outweighed the benefits.

301.    The PRODUCTS were in a defective condition and unreasonably dangerous, in that those products:

    a.    Suffered from manufacturing defects and were unreasonably dangerous because, due to Defendants' inability to manufacture, sell and/or distribute the PRODUCTS according to Defendants' specifications requiring that such products be asbestos free, were different from their intended design and failed to perform as safely as the intended design would have performed.

    b.    Did not provide an adequate warning of the potential harm that might result from exposure to talc and asbestos found in the PRODUCTS and, alternatively, did not have adequate instructions for safe use of the PRODUCTS.

    c.    Did not have warnings to persons, such as Decedent, who had been, or reasonably may have been, exposed to talc and asbestos found in the PRODUCTS, of their disease potential, and the proper steps to take to reduce the harmful effects of potential exposures.

    d.    Contained asbestos when and after it became feasible to design, manufacture and market reasonably comparable products not containing asbestos fibers.

302.    Decedent, unaware of the defective and unreasonably dangerous condition of Defendants' products at a time when such products were being used for the purposes for which they were intended, was exposed to talc and asbestos contained in Defendants' products.

303.    Each Defendant knew or should have known that their products would be used without inspection for defects, and by placing them on the market, represented that they would safely do the job for which they were intended.

304.    Decedent, unaware of the hazards and defects in the PRODUCTS, was exposed to talc and asbestos, causing her to develop ovarian cancer and making the PRODUCTS unsafe.

305.    Defendants' products were unreasonably dangerous because a less dangerous alternative, substitute or modification were economically feasible and readily available.  Decedent alleges that there were substitute materials for asbestos fibers known to each Defendant and unknown to Decedent, which could have been used by each Defendant in designing and manufacturing their products which Decedent handled, used, and was exposed. Being in the business of manufacturing, selling and distributing asbestos-containing products during the times pertinent to this suit, and being considered an expert in its field, each Defendant knew or should have known that Decedent or others similarly situated would come in contact with their asbestos-containing products, and would be exposed to asbestos by inhaling the asbestos fibers contained in each of their products, eventually causing fatal injuries including, but not limited to, ovarian cancer.

306.    As a direct and proximate result of the product defects as described herein, Decedent developed and passed away from ovarian cancer.

307.    Due to her ovarian cancer, Decedent required medical treatment; was greatly inconvenienced in her ability to lead and enjoy a normal life; was permanently impaired; was

unable to work; and passed away from her ovarian cancer.  As a result of her condition, Decedent suffered extreme pain, mental anguish, depression, and other physical and mental disorders; incurred medical expenses for treatment of physical and mental injuries; and was physically and permanently handicapped.  Said injuries are permanent and continuing in nature, causing Decedent to horribly suffer up until her death.

**WHEREFORE**, Plaintiff prays for judgment against Defendants on this count for compensatory damages against Defendants, for her costs expended herein, for interest and for such other and further relief both at law and in equity to which Plaintiff may show herself to be justly entitled.

## <u>WRONGFUL DEATH DAMAGES</u>

Plaintiff adopts, re-alleges and incorporates the allegations in paragraphs 1 through 307 above, and further alleges the following:

308.   As a direct and proximate result of the negligent acts and/or omissions of Defendants, TAMI D. ISA died from ovarian cancer on December 15, 2015.

309.   As a direct and proximate result of Decedent's diseases, injuries and death, Decedent's statutory survivors including her husband, BRYAN A. ISA, and children, RHIANNON ISA, ADDISON CHATTIN, and CHERILYN CHATTIN, (collectively "Survivors"), sustained a loss of Decedent's support and services, companionship, protection, instruction and guidance, comfort, society, attentions and/or consortium.

310.   As a direct and proximate result of Decedent's diseases, injuries and/or death, Decedent's Survivors have sustained mental pain and suffering, mental anguish, grief, loss of capacity to lead and enjoy a normal life, funeral expenses and expense of medical care, nursing care and/or hospitalization to treat Decedent's conditions.  Such damages, injuries and losses are

78

permanent and continuing in nature and Decedent's Survivors will suffer the aforementioned damages, injuries and losses in the future.

311.    As a direct and proximate result of Decedent's diseases, injuries and death, Decedent's Estate has sustained a loss of earnings, net accumulations, the cost of funeral expenses and/or the cost of medical care, nursing care and/or hospitalization of the Decedent.

312.    The aforementioned diseases, injuries and death of Decedent and damages of the Decedent's Survivors and estate were proximately caused by the negligence, failure to warn, product defects, misconduct and omissions of Defendants, their predecessors-in-interest, alter egos and/or co-conspirators as described herein.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable as a matter of right.

DATED: August 11, 2025.

Respectfully submitted,

THE FERRARO LAW FIRM, P.A.
*Attorneys for Plaintiff*
600 Brickell Ave., Suite #3800
Miami, Florida 33131
Telephone (305) 375-0111
Facsimile (305) 379-6222

By:*/s/ Jose L. Becerra*
JOSE L. BECERRA, ESQ.
Florida Bar No. 104893
jbecerra@ferrarolaw.com

79

Filing # 230029139 E-Filed 08/22/2025 12:30:48 PM

| ☒ IN THE CIRCUIT COURT OF THE 13TH JUDICIAL CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. | | |
| :--- | :--- | :--- |
| ☐ IN THE COUNTY COURT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. | | |

| DIVISION | WAIVER OF SERVICE OF PROCESS | CASE NUMBER |
| :--- | :---: | :--- |
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | (c) Forms for Services by Mail.<br>(2) Waiver of Service of Process. | 17-CA-010979 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK IN |
| :--- | :--- | :--- |
| BRYAN A. ISA, Individually<br>and as Personal Representative of<br>the Estate of TAMI D. ISA | JOHNSON & JOHNSON, JOHNSON<br>& JOHNSON HOLDCO (NA) INC.,<br>JANSSEN PHARMACEUTICALS,<br>INC., KENVUE INC., RED RIVER<br>TALC LLC, and PUBLIX SUPER<br>MARKETS, INC. | |

**TO:** Johnson & Johnson Holdco (NA) Inc., c/o William A. O'Leary, 98 S.E. 7th St., Ste. 700, Miami FL 33131

I acknowledge receipt of your request that I waive service of process in the lawsuit of _____ Isa _____ v. _____ Johnson & Johnson, et al. _____ in the ☒ Circuit ☐ County Court in Hillsborough County, Fl . I have also received a copy of the complaint, two copies of this waiver, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service process and an additional copy of the complaint in this lawsuit by not requiring that I, (or the entity on whose behalf I am acting), be served with judicial process in the manner provided by Fla. R. Civ. P.1.070.

If I am not the defendant to whom the notice of lawsuit and waiver of service of process was sent, and my authority to accept service on behalf of such person or entity is as follows: I declare that my relationship to the entity or person to whom the notice was sent and my authority to accept service on behalf of such person or entity is as follows:

(describe relationship to person or entity and authority to accept service) Attorney for Johnson & Johnson Holdco (NA) Inc.

_____.

   I, (or the entity on whose behalf I am acting), will retain all defense or objections to the lawsuit or to the jurisdiction or venue of the court except for any objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me, (or the party on whose behalf I am acting), if a written response is not served upon you within 60 days from the date I received the notice of lawsuit and request for waiver of service of process.

   **DATED ON** _____ 08/22/2025 _____

   _____ /s/ William A. O'Leary _____
   Defendant or Defendant's Representative

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

| | | |
|---|---|---|
| ☒ IN THE CIRCUIT COURT OF THE 13TH JUDICIAL CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. | | |
| ☐ IN THE COUNTY COURT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. | | |

| DIVISION | WAIVER OF SERVICE OF PROCESS | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | (c) Forms for Services by Mail.<br>(2) Waiver of Service of Process. | 17-CA-010979 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK IN |
|---|---|---|
| BRYAN A. ISA, Individually<br>and as Personal Representative of<br>the Estate of TAMI D. ISA | JOHNSON & JOHNSON, JOHNSON<br>& JOHNSON HOLDCO (NA) INC.,<br>JANSSEN PHARMACEUTICALS,<br>INC., KENVUE INC., RED RIVER<br>TALC LLC, and PUBLIX SUPER<br>MARKETS, INC. | |

**TO:** Janssen Pharmaceuticals, Inc., c/o William A. O'Leary, 98 S.E. 7th St., Ste. 700, Miami FL 33131

I acknowledge receipt of your request that I waive service of process in the lawsuit of _____Isa_____ v. _____Johnson & Johnson, et al._____ in the ☒ Circuit ☐ County Court in _Hillsborough County, Fl_. I have also received a copy of the complaint, two copies of this waiver, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service process and an additional copy of the complaint in this lawsuit by not requiring that I, (or the entity on whose behalf I am acting), be served with judicial process in the manner provided by Fla. R. Civ. P.1.070.

If I am not the defendant to whom the notice of lawsuit and waiver of service of process was sent, and my authority to accept service on behalf of such person or entity is as follows: I declare that my relationship to the entity or person to whom the notice was sent and my authority to accept service on behalf of such person or entity is as follows:

(describe relationship to person or entity and authority to accept service) _____Attorney for Janssen Pharmaceuticals, Inc._____

_____.

        I, (or the entity on whose behalf I am acting), will retain all defense or objections to the lawsuit or to the jurisdiction or venue of the court except for any objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me, (or the party on whose behalf I am acting), if a written response is not served upon you within 60 days from the date I received the notice of lawsuit and request for waiver of service of process.

        **DATED ON** _____08/22/2025_____

        _____/s/ William A. O'Leary_____
        Defendant or Defendant's Representative

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

Filing # 230029540 E-Filed 08/22/2025 12:32:08 PM

| ☒ IN THE CIRCUIT COURT OF THE 13TH JUDICIAL CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. |
| ☐ IN THE COUNTY COURT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. |

| DIVISION | WAIVER OF SERVICE OF PROCESS | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | (c) Forms for Services by Mail.<br>(2) Waiver of Service of Process. | 17-CA-010979 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK IN |
|---|---|---|
| BRYAN A. ISA, Individually<br>and as Personal Representative of<br>the Estate of TAMI D. ISA | JOHNSON & JOHNSON, JOHNSON<br>& JOHNSON HOLDCO (NA) INC.,<br>JANSSEN PHARMACEUTICALS,<br>INC., KENVUE INC., RED RIVER<br>TALC LLC, and PUBLIX SUPER<br>MARKETS, INC. | |

**TO:** Kenvue Inc., c/o William A. O'Leary, 98 S.E. 7th St., Ste. 700, Miami FL 33131

I acknowledge receipt of your request that I waive service of process in the lawsuit of _____ Isa _____ v.

_____ Johnson & Johnson, et al. _____ in the ☒ Circuit ☐ County Court in Hillsborough County, Fl . I have also received a copy of

the complaint, two copies of this waiver, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service process and an additional copy of the complaint in this lawsuit by not requiring that I, (or the entity

on whose behalf I am acting), be served with judicial process in the manner provided by Fla. R. Civ. P.1.070.

If I am not the defendant to whom the notice of lawsuit and waiver of service of process was sent, and my authority to accept service

on behalf of such person or entity is as follows: I declare that my relationship to the entity or person to whom the notice was sent and

my authority to accept service on behalf of such person or entity is as follows:

(describe relationship to person or entity and authority to accept service) _____ Attorney for Kenvue Inc. _____

_____.

    I, (or the entity on whose behalf I am acting), will retain all defense or objections to the lawsuit or to the jurisdiction or venue of

the court except for any objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me, (or the party on whose behalf I am acting), if a written response is not

served upon you within 60 days from the date I received the notice of lawsuit and request for waiver of service of process.

     **DATED ON** _____ 08/22/2025 _____

_____ /s/ William A. O'Leary _____
Defendant or Defendant's Representative

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**

| ☒ IN THE CIRCUIT COURT OF THE 13TH JUDICIAL CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. |
| :-- |
| ☐ IN THE COUNTY COURT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA. |

| DIVISION | WAIVER OF SERVICE OF PROCESS | CASE NUMBER |
| :-- | :--: | :-- |
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | (c) Forms for Services by Mail.<br>(2) Waiver of Service of Process. | 17-CA-010979 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK IN |
| :-- | :-- | :-- |
| BRYAN A. ISA, Individually<br>and as Personal Representative of<br>the Estate of TAMI D. ISA | JOHNSON & JOHNSON, JOHNSON<br>& JOHNSON HOLDCO (NA) INC.,<br>JANSSEN PHARMACEUTICALS,<br>INC., KENVUE INC., RED RIVER<br>TALC LLC, and PUBLIX SUPER<br>MARKETS, INC. | |

**TO:** Red River Talc LLC, c/o William A. O'Leary, 98 S.E. 7th St., Ste. 700, Miami FL 33131

I acknowledge receipt of your request that I waive service of process in the lawsuit of _____Isa_____ v. _____Johnson & Johnson, et al._____ in the ☒ Circuit ☐ County Court in _Hillsborough County, Fl_ . I have also received a copy of the complaint, two copies of this waiver, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service process and an additional copy of the complaint in this lawsuit by not requiring that I, (or the entity on whose behalf I am acting), be served with judicial process in the manner provided by Fla. R. Civ. P.1.070.

If I am not the defendant to whom the notice of lawsuit and waiver of service of process was sent, and my authority to accept service on behalf of such person or entity is as follows: I declare that my relationship to the entity or person to whom the notice was sent and my authority to accept service on behalf of such person or entity is as follows:

(describe relationship to person or entity and authority to accept service) _____Attorney for Red River Talc LLC_____

_____.

        I, (or the entity on whose behalf I am acting), will retain all defense or objections to the lawsuit or to the jurisdiction or venue of the court except for any objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me, (or the party on whose behalf I am acting), if a written response is not served upon you within 60 days from the date I received the notice of lawsuit and request for waiver of service of process.

        **DATED ON** _____08/22/2025_____

        _____/s/ William A. O'Leary_____
        Defendant or Defendant's Representative

---

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174; Email ADA@jud11.flcourts.org; Fax (305) 349-7355 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711."**